DOUGLAS THEATER CORPORATION, d/b/a Ivanhoe Theater, Plaintiff-Appellant and Cross-Appellee, v. GOLD STANDARD ENTERPRISES, INC., Defendant-Appellee and Cross-Appellant.

First District (6th Division)   No. 1—88—0717

Opinion filed September 8, 1989.—Rehearing denied October 10, 1989.

John August Cook, of Chicago, for appellant.

Jack J. Herman and Herbert C. DeYoung, both of Chicago, for appellee.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

This case involves a dispute between two businesses that shared a parking lot. The plaintiff, Douglas Theater Corporation (Douglas), which operates the Ivanhoe Theater in Chicago, filed a complaint for injunction against the defendant, Gold Standard Enterprises, Inc. (Gold Standard), which operates a liquor store. Gold Standard filed a counterclaim for injunction against Douglas. After a bench trial, the judge denied any relief sought by Douglas and granted some of the relief sought by Gold Standard. Both appeal.

■ At the outset we address two motions of the defendant, contained in its brief, one to strike the statement of facts of the plaintiff and the other to strike a sketch which is included as an exhibit in the plaintiff's brief. The plaintiff did not file a reply brief or respond to the motions which, we observe, did not comply with Supreme Court Rule 361 (107 Ill. 2d R. 361) in that they were made in the body of the brief. While we do not mean to express satisfaction with the statement of facts submitted by the plaintiff, we deny the motion to strike, since some parts of the statement of facts are accurate and the inaccuracies and incompleteness of the other parts have been called to our attention by the defendant. Consequently, our ability to review the case has not been hindered. See *James v. Yasunaga* (1987), 157 Ill. App. 3d 450, 510 N.E.2d 531.

The sketch to which the defendant objects is copied, with some additions, from plaintiff's exhibit 3, a plat of survey (which is virtually identical to defendant's exhibit 8). The plaintiff has added lines purporting to illustrate the location of parking spaces and has also added typewritten descriptions of various aspects of the exhibit. For example, some of the typewritten additions purport to show points of exit and entrance to the parking lot, the "Ivanhoe encroachment on alley," the "vacated alley" and the number of parking spaces as established by the testimony. The defendant does not contend that the exhibit is inaccurate. We are frank to say that we find the exhibit helpful in understanding the case. Therefore, since the sketch is based on exhibits in evidence, there is no claim that it is inaccurate and it does assist the court, we deny the motion to strike.

The parties were tenants of a common landlord which also owned the parking lot. The Gold Standard lease was dated May 22, 1978, and ran to September 30, 2003; the Douglas lease was dated March

15, 1982, and ran to June 30, 1987.

In 1982, Harold Binstein, the sole owner of Gold Standard, purchased the property including the parking lot, subject to the leases. The Douglas lease contained a purchase option which included an extension of the lease rights to the parking lot. The option was exercised, and Douglas received title to the underlying theater property. On June 30, 1987, Douglas and Binstein entered a separate parking lot lease which ran to September 30, 2003, containing the same provisions as the original lease. Both the Douglas lease and Gold Standard lease contained detailed parking provisions. Each lessee promised to operate the lot in compliance with all Federal, State and local laws; and both leases give Gold Standard "primary responsibility for the supervision, maintenance and operation" of the parking lot during the hours that Gold Standard is open. Both leases also provide that each lessee's use shall be in common with the other on a "first-come-first-serve basis." Both lessees pay the same amount of rent.

The lot has approximately 115 feet of frontage on Clark Street with two driveways. The main entrance to the Ivanhoe Theater is on the north side of Wellington and the theater is immediately to the west of Gold Standard. The lot in question is to the north of the Ivanhoe and Gold Standard. Between the Ivanhoe, Gold Standard and the parking lot is a public alley 14 feet wide which runs from Clark Street on the east to Halsted Street on the west. The alley was vacated a few months before the trial began. The main entrance of Gold Standard is on the southeast corner of the juncture of the alley and Clark Street. Entry to the Ivanhoe may also be made directly from the parking lot. The focal point of this case is an area of 10 feet from the wall of Gold Standard to 66 feet west of the sidewalk on Clark Street and includes a 30-foot by 7-foot section just outside the entrance to Gold Standard. The rest of the area includes, in part, the Gold Standard loading dock.

At the time Douglas began its operation in 1982, Douglas was able to direct most of its patrons to a parking lot on the east side of Clark Street. In April 1985 that lot became unavailable when a shopping mall was built on it. From that time, Douglas began to put in the parking lot as many of its patrons that would fit the approximately 60 spaces.

Gold Standard is open year round from 10 a.m. to 10 p.m. on weekdays and Saturday and noon to 6 p.m. on Sundays. The Ivanhoe was in use about 40 weeks each year. A typical week ran from Tuesday through Sunday for a total of about eight shows. The weekday evening performance ran from 8 p.m. until after the 10 p.m. closing

of Gold Standard; the Saturday shows began about 6 p.m. and 9 p.m., while the Sunday shows began at 3 p.m. and 7 p.m. Beginning in 1985, Douglas instructed its employees to fill first the parking spaces farthest from Gold Standard. When the lot was filled, the employees were instructed to park next to the north wall of the Gold Standard store. The area would hold seven to nine cars parked at right angles to the store. There was testimony that these cars would block the loading zone and the fire exits. There was also evidence that the parking lot was inadequate for both businesses and that Gold Standard customers were often unable to park in the lot. Some of Gold Standard's suppliers had to unload on Clark Street.

Gold Standard employed a security guard to direct parking only three or four times each year, when business at the liquor store was especially heavy. During performances Douglas charged $3 to park in the lot and employed a security guard whose duty it was to collect the fee and direct the cars into the lot. Before April 1985, the guard worked at the lot across Clark Street and would use the subject lot only for overflow. The guard was instructed to ask each driver which establishment he intended to patronize; and Gold Standard customers were to be allowed to park at no charge.

Both sides had been using Lincoln Towing Company to remove illegally parked cars and cars of non-customers. The arrangement was that Lincoln would begin towing after 11 p.m. or after 10 p.m., if all the customers had already gone. Binstein, the owner of Gold Standard, testified that the defendant rarely towed cars because when a car was illegally parked, the store would make an announcement asking the driver to move the vehicle. However, the Gold Standard manager testified that he had towed cars during the day if he saw the driver park the car and go someplace other than to the theater or the store. He did not have cars towed at night during theater performances, because he thought the theater was supervising the lot at those times. Binstein denied that there was an arrangement between Gold Standard and Douglas to allow Douglas to tow cars; but Douglas Bragan, the president of Douglas, testified that Douglas did tow cars but only after checking with Gold Standard to make certain that the car did not belong to a Gold Standard customer.

Gold Standard began objecting in December of 1984, during a sell-out theater performance, because the cars parked along its north wall were impeding access to the store; and Gold Standard threatened to tow them. Bragan called the Chicago police, who instructed him to move the cars. Despite that instruction, however, Douglas continued to park along the north wall when needed. Gold Standard argued that

this practice prevented customers from entering the store and ultimately caused the store to lose business and good will. The dispute came to a head a year later in December of 1986. Gold Standard painted striped yellow lines to indicate no parking in the area about 10 feet wide next to the north wall of the store. Signs were posted warning that violators would be towed. On one occasion Gold Standard placed stickers on cars parked in that area warning that they would be towed.

On December 9, 1986, and again on February 25, 1987, attorneys for the plaintiff wrote letters to Lincoln Towing advising Lincoln of the dispute and that it could be subject to litigation if Lincoln towed any of the cars of the theater patrons. As a result Lincoln refused to tow cars from the lot.

This suit was filed on December 23, 1986. The plaintiff requested that the defendant be enjoined: "(a) from designating any area of said lot as exclusively for its own use; (b) from putting up any notice of illegal parking or threatening to tow or actually towing any automobile of Plaintiff's employees, invitees or patrons parked in said parking lot; (c) from instructing Lincoln towing to not respond to Plaintiff's request for towing service in regard to said parking lot; and (d) from interfering in any way from plaintiff's use of said parking lot pursuant to the Lease terms."

The defendant filed its counterclaim on January 12, 1987, asking that the plaintiff be enjoined: "(a) from directing or permitting the parking of cars in any portion of said parking lot other than designated parking spaces, especially in any area within 30 feet of counter-plaintiff's store, and from blocking any entrances or access to said parking lot or spaces; (b) from instructing Lincoln Towing Company not to respond to counter-plaintiff's request for towing service in regard to said parking lot; (c) from interfering in any way with counter-plaintiff's use of the loading and entrance areas adjacent to its store; (d) from interfering in any way with counter-plaintiff's supervision and operation of said parking lot during the hours counter-plaintiff is open for business."

At the conclusion of the trial the judge denied all relief sought by the plaintiff but did grant the following injunctive relief:

> "Plaintiff and counter-defendant, Douglas Theater Corporation and defendant and counter-plaintiff Gold Standard Enterprises, Inc., are hereby permanently enjoined and prohibited from directing or permitting the parking of cars in any portion of the parking lot other than the designated parking spaces, especially an area within 30 feet of counter-plaintiff Gold Stand-

ard Enterprises, Inc.'s store, and from blocking the entrances and exits to the parking lot or spaces during the hours the Gold Standard store is open for business. All other relief sought by counter-plaintiff, Gold Standard, in its counterclaim, is denied."

We will first consider the plaintiff's appeal. We interpret the plaintiff's appeal to be restricted to the denial of its prayer for an order barring the defendant from designating any area as "exclusively for its own use." The plaintiff's threshold argument is that the court erred in construing the language of the lease, because the judge, in the opinion of the plaintiff, hinged his ruling on the language of the lease that gave the defendant "primary responsibility for the supervision, maintenance and operation" of the parking lot. The plaintiff further contends that the judge ignored the provision of the lease that makes the lot available to both parties on a "first-come-first-serve basis." We do not construe the judge's remarks to be a refusal to consider all of the provisions of the lease. To do so would require that we ignore the evidence that the judge heard and in addition the order for a preliminary injunction he had previously entered.

On August 24, 1987, while this case was pending, the Chicago Bureau of Fire Prevention issued a notice to the defendant to discontinue parking in front of the exit doors at the premises. The defendant then filed a petition for a "temporary [sic] injunction" seeking to bar the plaintiff from directing or permitting the parking of vehicles in front of all of the entrances, exits and doors of the Gold Standard store and from contacting any towing companies for the purpose of inducing the companies not to tow cars from the lot at the request of Gold Standard. The record does not reflect what evidence the judge heard; but, he granted what we construe to be a preliminary injunction enjoining the plaintiff from permitting the parking of vehicles near the north wall; and he denied the relief seeking to bar the plaintiff from contacting towing companies.

The defendant has raised several arguments in support of the judge's holding; but the plaintiff has not responded in a reply brief. We believe that those arguments have merit.

The defendant presented the testimony of a fire inspector that parking in front of the exit was a violation of the fire code. The plaintiff, in rebuttal, called another inspector who testified that since the doors open 30 inches, cars parking four feet away would provide adequate clearance. Bragan testified that the theater's patrons' cars were never parked any closer than four feet. However, his testimony was weakened by his written instructions to his parking attendant to "disregard all 'no parking' signs and 'loading zone' fire exit doors" and

by his deposition testimony that no special parking instructions were given to the theater employees limiting where cars could be parked. In addition, the defendant's manager testified that the theater's patrons' cars were frequently parked right up to the north wall.

The defendant points out that it is the public policy of this State to preserve access to public facilities for the handicapped. (See Ill. Rev. Stat. 1987, ch. 111½, par. 3712, 3713(r)(2).) The defendant established that the doors on the north wall are entrances for handicapped persons which were not accessible on some occasions to handicapped persons when cars were parked close to the wall. The defendant also cites the loading zone ordinances that require retail establishments such as Gold Standard to have an off-street loading area of two berths, consisting of an area 10 feet by 25 feet each, for a total of 500 square feet. (See Chicago Municipal Code §§194A—8.10(2)(3), 194A—8.10—1(3), 194A—8.10—4(1), 194A—9.10(2), 194A—9.10—1(7) (1987).) The four-foot zone proposed by the plaintiff would not be sufficient to meet that requirement.

■■ ■ In deciding whether an injunction should issue, the judge must also consider the effect of the order on the public; an injunction will not be issued where it will cause serious public loss without corresponding great advantage to the plaintiff. (*Biggs v. Health & Hospitals Governing Comm'n* (1977), 55 Ill. App. 3d 501, 370 N.E.2d 1150.) The right to first-come-first-served use of the lot cannot mean that the lot may be used in such a way as to interfere with the use by another lessee for the normal operation of its business and, most importantly, it cannot mean that the lot may be used in violation of existing laws or contrary to the public interest.

The plaintiff's principal contention is that the order should be reversed because it allows cars of the defendant's customers to be parked in the disputed area while barring the plaintiff from doing so. That is not what the order says. The order enjoins both the plaintiff and the defendant from permitting cars to be parked in the specific area while the defendant is open for business. Contrary to the plaintiff's argument, Douglas is not powerless. If the defendant violates the injunction order, it is subject to the discipline of the court.

For these reasons, we believe that there was sufficient evidence to support the judge's finding; and it is not for this court to substitute our judgment for his. (*Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365, 247 N.E.2d 894.) The order denying the plaintiff's prayer for injunctive relief is affirmed.

We will consider the merits of the cross-appeal even though the plaintiff has not filed a brief in response. (See *First Capitol Mortgage*

*Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 345 N.E.2d 493.) The defendant first contends that the court erred in refusing to enjoin Douglas from charging a parking fee.

■ The defendant's counterclaim did not pray for an order enjoining the plaintiff from collecting a parking fee, although it did plead that the parking fee was illegal. Therefore, this court may not consider relief not requested in the trial court. (*Bowman v. Austin* (1946), 393 Ill. 593, 67 N.E.2d 168; *Bell v. Yale Development Co.* (1981), 102 Ill. App. 3d 108, 429 N.E.2d 894.) Moreover, the defendant has made us aware that the plaintiff was in violation of a municipal ordinance: it was not licensed to operate a parking lot and it failed to reimburse the City of Chicago. Therefore, since the conduct of which the defendant complains is quasi-criminal and does not constitute any irreparable injury to property, denial of an injunction would not be an abuse of discretion. (See 21A Ill. L. & Prac. *Injunctions* §111 (1977).) The defendant did not establish any irreparable injury to its property. The evidence it introduced that people complained about being approached for payment for parking was not admitted to establish the truth of the evidence.

■ The defendant also contends that the court erred in refusing to order the plaintiff to refrain from communicating with Lincoln Towing in an attempt to keep Lincoln from towing at the request of the defendant. The defendant's argument is based on two letters sent by attorneys for the defendant to Lincoln Towing. The last is dated February 25, 1987, and was sent after the lawsuit was filed. The defendant's argument must fall for at least two reasons that an examination of the letter will disclose. First, the prayer of the complaint was for an order to enjoin the plaintiff from "instructing" Lincoln not to tow cars from the lot; and there is no proof that the plaintiff "instructed" Lincoln. For that matter, it is clear that the plaintiff was in no position to "instruct" Lincoln. Second, circumstances now exist after the entry of the order that obviate any difficulty for Lincoln to agree to tow cars from the lot at the request of either the plaintiff or the defendant.

By no means can the letter be construed as an "instruction" by the attorneys for the plaintiff to Lincoln Towing. The letter provides, in part, as follows:

> "I suggest that if you begin to resume towing, you should recognize both parties' authority to tow as part of their right to full utilization of the lot. Moreover, I have also suggested that before Lincoln Towing tow any cars from anywhere in the joint parking lot, based on a Gold Standard tow request, that Lin-

coln Towing first check with the Ivanhoe Theater manager or the theater security person on duty to determine if the car belongs to a theater patron; and if it does, the car should not be touched. Otherwise, if any theater customer's car is towed, under sole authority purportedly granted by Gold Standard Liquors, the theater may have to look to Lincoln Towing to answer for damages, including loss of good will, which may accrue directly or indirectly from the towing. Lincoln Towing could thus be brought into the lawsuit."

In addition, and more important, is the following language of the letter:

"Moreover, at this time there is *no court order* limiting where cars may park in this lot nor any court order regarding towing.

\* \* \*

At this time there is, I reiterate, no agreement and no court order regarding towing rights in the parking lot. You are therefore, on notice of the theater's interest in the entire parking lot area and I strongly suggest you govern your actions accordingly until this dispute is resolved between the two parties." (Emphasis in letter.)

There now is a court order, and the dispute has been resolved. Consequently, the letter does not constitute support for the issuance of the injunction requested by the defendant. There seems no likelihood that Lincoln or any other towing company would now be dissuaded from towing from the proscribed area.

The judge, in denying the injunction, also said that it would constitute an infringement of the plaintiff's first amendment rights to free speech and that he had no right to interfere with the actions of Lincoln Towing, which was not before him. The defendant has not addressed those grounds advanced by the judge. An extensive discussion of those grounds is not necessary in view of our holding; but we do believe they were matters properly considered by the judge in the exercise of his discretion. For these reasons, the order denying part of the relief claimed by the defendant is affirmed.

Judgment affirmed.

McNAMARA and QUINLAN, JJ., concur.