DOUGLAS THEATER CORPORATION, Plaintiff-Appellee, v. CHICAGO TITLE AND TRUST COMPANY, as Trustee, *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 1—88—1859, 1—89—1365 cons.

Opinion filed February 22, 1991.—Rehearing denied March 21, 1991.

Jack J. Herman, P.C., and Herbert C. DeYoung, both of Chicago, for appellants.

John August Cook, P.C., of Chicago (John August Cook and Mercedes Matias, of counsel), for appellee.

JUSTICE MURRAY delivered the opinion of the court:

This opinion addresses two appeals and a cross-appeal from orders entered in a suit for specific performance involving certain real property located in Chicago, Illinois. A third appeal involving the same parties and concerning certain adjoining property has already been decided by another division of this court. See *Douglas Theater Corp. v. Gold Standard Enterprises, Inc.* (1989), 188 Ill. App. 3d 573, 544 N.E.2d 1053.

The facts of the present case are as follows.

Pursuant to trust agreement No. 32967, dated May 1, 1974, American National Bank and Trust Company of Chicago (American National), as trustee, was titleholder to certain property located at the intersection of Wellington and Clark Streets in Chicago. A portion of this property once housed the old Ivanhoe Theater and Restaurant, a one-time favorite haunt of Chicago's young college students who would traverse the catacombs underneath the establishment and reminisce of the days when knighthood was in its flower. This property, however, was later extensively damaged by fire. Another portion of the property included unimproved land used for a parking lot (which was the subject of the related appeal at 188 Ill. App. 3d 573).

On May 22, 1978, American National entered into a contract with Gold Standard Enterprises, Inc. (Gold Standard), an Illinois corporation owned by Harold Binstein, to lease a portion of the above-described property. The 24-page lease provided that American National was demising to Gold Standard the premises, commonly known as 3000 N. Clark Street, but legally described as follows:

"Lots 1, 2, 3, and the East 15 feet of Lot 4 in Dam and Warner's Subdivision of Block 3 in Knoke and Gardner's Subdivision of the 20 acres North and adjoining the South 30 acres of the West ½ of the Northwest ¼ of Section 28, Township 40 North, Range 14 East of the Third Principal Meridian, in Cook County, Illinois."

The reference for this legal description was apparently a plat of survey dated May 28, 1974, which depicted the property as it existed when the old Ivanhoe Theater and Restaurant occupied the premises. The demise to Gold Standard actually involved a portion of what was labeled parcel 1 on this survey. See diagram 1.

The demise included improvements "presently or hereafter constructed" on the parcel, as well as easements, rights and appurtenances to the parcel, but made no reference to basement areas or the elevations to which the lease was restricted. The lease contained language indicating that Gold Standard was accepting possession of the premises "as is," with the understanding that "the fire-damaged building upon the premises" was to be restored and converted into a commercial retail space, housing an establishment for the sale of "liquor, food, tobacco products and related and sundry merchandise." The architectural plans and specifications for these renovations were not yet provided, but were to meet with the approval of both parties. The lease was to be in effect until September 30, 2003.

Pursuant to this lease agreement, renovations to the property were made, and a liquor store, owned and operated by Gold Standard Liquors, Inc., an Illinois corporation controlled by Harold Binstein, occupied the premises. Chalet Internationale, Inc., another Illinois corporation controlled by Harold Binstein or Gold Standard, directly or indirectly, may also be in possession of the leased premises, in whole or in part.

On March 15, 1982, American National entered into a contract with Douglas Theater Corporation (Douglas), to lease the parcel of land adjoining the property leased to Gold Standard. The 85-page lease agreement recited that American National was demising to Douglas the premises commonly known as 750 W. Wellington in Chicago, but described in exhibit A as:

"Lots 4 (except the East 15 feet thereof) 5, 6, and 7 in Dam and Warner's Subdivision of Block 3 in Knoke and Gardner's Subdivision of the 20 acres North and adjoining the South 30 acres of the West ½ of the Northwest ¼ of Section 28, Township 40 North, Range 14 East of the Third Principal Meridian, in Cook County, Illinois. (The parties recognize that the easterly line of the Premises may be somewhat irregular and may vary slightly at the basement, first floor and roof levels, but the interior of the Premises are to be as presently divided by existing walls.) Also included is all of Lessor's existing and future right, title and interest in and to that portion of the public alley shown in Appendix 'A' attached hereto as outlined in red and shaded in orange. Said

public alley extends approximately 218 feet in an east-west direction between Clark Street and Halsted Street approximately 142 feet (center line) north of Wellington Street in Chicago, Illinois."

The lease further provided, in section 1(a)(i), that the above legal description was "subject to and to be replaced by a precise legal description of said parcel of land (and portion of public alley) as set forth in a plat of survey to be prepared in accordance with Illinois Land Survey Standards by a duly registered Illinois land surveyor at Lessor's expense and delivered to Lessee within forty-five (45) days from and after the date of delivery of possession of the Premises to Lessee."

The lease also demised "all structures and improvements presently or hereafter constructed on such parcel and *all of Lessor's [American National's] right, title, and interest, if any, in and to all structures and improvements lying on and over the portion of the public alley referred to in said Exhibit A,*" (emphasis added) as well as all easements, rights and appurtenances relating to such parcel. This provision was included since the existing fire-damaged building encroached upon the entire 14-foot alley to the north of lots 6 and 7. Certain fixtures and furnishings, collectively referred to as "equipment," were also demised, but are not involved in the appeal.

In a separate paragraph, entitled "Bar Area Basement," the following provision was included:

"Notwithstanding anything to the contrary contained in this Lease, the space now leased to Gold Standard Enterprises, Inc. and situated beneath the portion of the Premises formerly used for the sale and dispensing of alcoholic beverages (which space is herein called 'the Bar Area Basement') is not included in the demise granted in this lease, such that during the Term, Lessee shall have no obligation or liability with respect to the Bar Area Basement, but the Bar Area Basement shall be included in the Property subject to the option to purchase the Property as set forth in Section 10 (captioned 'Purchase Option') of this Lease. The Bar Area Basement shall be more particularly described on a plat of survey to be prepared at Lessor's expense by a duly licensed land surveyor and delivered to Lessee or its agent within forty-five (45) days of delivery of possession hereunder to Lessee."

Additionally, the lease indicated that the property was being transferred "as is" and that renovations and alterations were to be made in accordance with architectural plans already submitted and approved, so that the property could be used for the operation of a theater. The lease was to be in effect until June 30, 1987, unless terminated sooner by

Douglas' exercise of the option to purchase, as provided for within the lease.

On April 2, 1982, a plat of survey was drawn, as required by the lease agreement. This survey was drawn by Christian H. Froemke after an on-site "walk through" of the property. The liquor store on the adjacent property was already in existence but the property to be surveyed, referred to as "the theater area" was still in a burned-out condition. Although this survey was supposed to depict the property subject to the lease agreement, Mr. Froemke was not given a copy of the lease agreement, but rather was directed by Mr. Jack Frigo, a real estate agent for Bennett and Kahnweiler, regarding the parcels to be included in the survey. Basically, Mr. Froemke was told to follow the face of the walls of the buildings already existing on the property, both above and below ground.

On this plat of survey, the property was divided into two parcels, parcel 1 and parcel 2. Essentially, parcel 1 consisted of lots 5, 6, and 7 of Dam and Warner's subdivision. However, the eastern boundary of this parcel was delineated by the walls of the basement area located beneath the tract. Parcel 2 depicted those portions of lots 3, 4, and 5 of Dam and Warner's subdivision above what was apparently considered the "Bar Area Basement." The eastern boundary of the parcel was delineated by following the face of the interior walls at the first-floor level. The words "not included" were written across the portion of the public alley upon which the building encroached, located to the north of Parcel 1 (above lots 6 and 7 and a portion of lot 5) and also on the lower limit of parcel 2, *i.e.*, the basement area located beneath parcel 2. See diagram 2.

On August 8, 1983, Harold Binstein purchased the property formerly owned by American National, subject to the Gold Standard and Douglas leases and Douglas' option to purchase. Title to this property was placed in Chicago Title and Trust Company (Chicago Title), as trustee of trust No. 1083978, with Harold Binstein as sole beneficiary.

In December 1986, Douglas sought to exercise the purchase option contained within the 1982 lease agreement. At this time a dispute arose over the interpretation of the lease agreement and the premises which were subject to the purchase option, based upon discrepancies between the lease and the legal description of the property as indicated by the plat of survey drawn in April 1982. Chicago Title, as trustee, and Harold Binstein, as beneficiary, refused to convey certain portions of the property, to which Douglas believed it was entitled, namely, the basement beneath parcel 2 as shown in the April 1982 survey and the northern one-half of the "public alley," which, at the time of closing on May 14, 1987, had been vacated by the City of Chicago. Douglas proceeded

with the closing on the sale of the property under a reservation of rights and then on September 23, 1987, filed a complaint for specific performance, asking that the court enforce the purchase option contained within the lease and require the named defendants to convey the disputed property.

On January 28, 1988, Douglas moved for partial summary judgment with respect to the alley issue. Defendants filed a cross-motion for partial summary judgment, and on May 15, 1988, a final judgment was entered, granting Douglas' motion and denying defendants' motion for partial summary judgment. The order directed Chicago Title and Harold Binstein to "take all necessary steps to convey" the property described as follows:

"The North ½ of the 14 foot vacated alley lying North of the North Line of Lots 5, 6, and 7 and North of that portion of the North Line of Lot 4 which lies West of a point on the North Line of Lot 4 which is 82.87 feet East of the Northwest Corner of said Lot 7 (as measured along the North Lines of said Lots 4, 5, 6,and 7) in Dam and Warner's Subdivision of Block 3 in Knoke and Gardner's 30 Acres of the West ½ of the Northwest ¼ of Section 28, Township 40 North Range 14 East of the Third Principal Meridian in Cook County, Illinois."

After proceedings were held on the remainder of Douglas' complaint for specific performance, judgment was entered in Douglas' favor. The final order, as modified after hearing motions for reconsideration, directed defendants to convey to Douglas the property as follows:

"(a) That portion of Lot 4 in Dam and Warner's Subdivision in Section 28, Township 40 North, Range 14 East of the Third Principal Meridian, lying between the East Line of Parcels 1 and 2 on the survey dated January 21, 1988, admitted in evidence as Joint Exhibit 7, and the center line of the existing west wall of the store building operated by Gold Standard Enterprises Inc., and extending from the North Line of Parcel 1 extended East to the center of the North End of said wall to a point in the South end of said wall, which is 19.25 feet North of the South line of Parcel 2. Both Parties shall be bound by the Party Wall Agreement on pages 63-69 of the 'Douglas Theater Lease', in evidence as Joint Exhibit 2, as to said party wall.

(b) That portion of Parcel 2, shown on the survey dated January 21, 1988, admitted in evidence as Joint Exhibit 7, at or below elevation 22.29 and marked on said survey as 'Not Included', subject to the existing Gold Standard lease (Joint Exhibit 1) covering that portion of said basement East of the West Line of the

East 15 feet of Lot 4, shown on Joint Exhibit 7 as consisting of 248.8 square feet."

The order denied Douglas' request for attorney fees and costs, but reserved judgment on the issue of damages, pending any appeals.

In a notice filed June 15, 1988, defendants appealed the May 19, 1988, order granting Douglas' motion for partial summary judgment (appeal No. 1—88—1859), and in a notice filed May 23, 1989, defendants appealed the order dated March 9, 1989, as modified by the order dated April 27, 1989 (appeal No. 1—89—1365). Douglas filed a notice dated June 1, 1989, cross-appealing the March 9, 1989, order as modified by the April 27, 1989, order, asking this court to reverse the trial court's denial of attorney fees and costs. After hearing oral argument on the first appeal (1—88—1859), the appeal was consolidated with the second appeal for review by this court. As noted earlier, the matter of damages remains pending in the lower court.

THE ALLEY

On this issue defendants contend that summary judgment should not have been granted in Douglas' favor. They argue that the evidence, namely the Douglas lease together with the April 2, 1982, plat of survey, clearly established that conveyance to Douglas of fee title to the public alley to the north of the theater property, including that portion of the alley upon which the theater building encroaches, was not required and that summary judgment should have been granted in their favor. In support of this notion defendants point to the fact that the description of the premises in the Douglas lease included the statement that it was "subject to and to be replaced by" a more precise description and that the more precise description, supplied by the April 1982 survey, contained the words "not included" across the portion of the alley upon which the building encroached, thereby indicating, according to defendants, the intention of the owner to exclude this land from the demise. Alternatively, defendants seek reversal and remand for further proceedings, contending that a genuine issue of material fact was raised by the conflicting inferences or ambiguity created by the above-mentioned documents, which should have precluded summary judgment.

While we agree with defendants' statement of the law, that summary judgment is a drastic remedy to be awarded with caution (*Gatlin v. Ruder* (1990), 137 Ill. 2d 284, 293, 560 N.E.2d 586), we cannot agree that the trial court erred in granting summary judgment in Douglas' favor.

■■■ Summary judgment is available to a party, as a matter of law, if the pleadings, taken together with any depositions, admissions or affi-

davits, demonstrate that there is no genuine issue of material fact. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005(c).) Yet the mere allegation that a material fact exists does not create such an issue or avoid the imposition of summary judgment. (*Turner v. Chicago* (1980), 91 Ill. App. 3d 931, 415 N.E.2d 481.) In the present case, there was no dispute over the validity of the lease and option contract, but rather a dispute over the interpretation of the document. Interpretation of a lease is a question of law when the terms are clear and unambiguous. (*Pioneer Trust & Savings Bank v. Lucky Stores, Inc.* (1980), 91 Ill. App. 3d 573, 414 N.E.2d 1152.) An ambiguity is not created because the two parties cannot agree. An ambiguity occurs only when the language is reasonably susceptible to more than one meaning. (*W.H. Lyman Construction Co. v. Village of Gurnee* (1985), 131 Ill. App. 3d 87, 475 N.E.2d 273.) Whether an ambiguity exists in a lease contract is a question of law to be determined by the court. (*The Advertising Checking Bureau, Inc. v. Canal-Randolph Associates* (1981), 101 Ill. App. 3d 140, 427 N.E.2d 1039.) Here, the trial court found that no ambiguity existed. We agree.

■ The language of the Douglas lease, which contained the option to purchase, clearly and plainly included in the demise the owner's existing and future rights to the entire alley to the north of the property leased to Douglas. To find an ambiguity one must go outside the lease document, to the April 1982 survey, where a portion of the public alley is marked "not included." However, even if we were to consider this extrinsic evidence, defendants can provide no plausible explanation for the inclusion of the term "not included" on the survey, especially since the term only appeared on that portion of the alley upon which the building encroached.

The surveyor who drew up the April 1982 plat of survey testified that he was instructed to exclude the alley. But this instruction apparently came from the realtor and the surveyor did not have access to a copy of the lease. Thus, whether the inclusion of the phrase "not included" was meant to express the owner's desire to exclude the alley from the demise is pure conjecture, and one which contravenes the clear and express terms of the lease contract.

The lease defined the premises as "the parcel of land described in Exhibit A hereto, subject to and to be replaced by a precise description of said parcel of land (and portion of the public alley) as set forth on a plat of survey to be prepared." Exhibit A then described the premises with reference to a plat of survey made in 1974 (see diagram 1), although it was known by the parties to the lease that this plat of survey was outdated and imprecise because it did not take into account the changes made to the property as a result of the 1978 Gold Standard

Lease, in which the property to the east of the Douglas property was demised. The new plat of survey was necessary to depict and describe the premises as it then existed, taking into account the irregular easterly line of the premises. However, nothing in the lease indicates that the new plat of survey was intended to alter the substance of the lease agreement or in any way define its terms with respect to the premises being demised.

Furthermore, exhibit A stated unequivocally that "(a)lso included [in the demise] is all of Lessor's existing and future right, title and interest in and to that portion of the public alley shown in Appendix 'A' attached hereto as outlined in red and shaded in orange. Said public alley extends approximately 218 feet in an east-west direction between Clark Street and Halsted Street approximately 142 feet (center line) north of Wellington Street in Chicago, Illinois." The diagram contained in appendix A to exhibit A clearly and plainly demonstrated that whatever rights the owner possessed in the entire public alley to the north of the property being leased to Douglas were contemplated by the parties as part of the demise subject to the purchase option. The only hindrance to the outright demise of this portion of the property, in either the lease or the option to purchase, was the fact that the alley was "public" so that right, title and interest to the alley was held, not by Lessor, but by the City of Chicago. This reasonably explains the purpose for the term "not included" on the survey. We note, too, that American National obligated itself, in exhibit F to the lease, to use its best efforts to secure the vacation of the public alley if for any reason the encroaching theater building interfered with Douglas' quiet enjoyment of the property.

On May 13, 1987, after the exercise of the option on December 22, 1986, but prior to the closing on July 10, 1987, the alley was vacated pursuant to Chicago city council ordinance. The purchase option irrevocably granted Douglas the option to purchase "the Property [earlier defined as 'the Premises' and 'the Equipment'] AS IS in the condition existing on the date the option herein is exercised and closed." When Douglas exercised its option to purchase in December 1986 it became the titleholder, in equity, to the property (*Hanson v. Duffy* (1982), 106 Ill. App. 3d 727, 435 N.E.2d 1373) and to any existing or future right, title or interest of the record titleholder in the public alley. The public alley was then vacated and, pursuant to statute and case law (Ill. Rev. Stat. 1985, ch. 24, par. 11—91—2), title was vested in the then owner of the abutting property. In this way, Douglas became titleholder in equity to the southern one-half of the vacated alley, while Chicago Title, as trustee, became record titleholder to the alley, subject to the Douglas lease and purchase option. Consequently, at the time of closing on July

10, 1987, Douglas became entitled to all of the right, title and interest in the entire alley. For the above reasons, we must conclude that the trial court's grant of partial summary judgment to Douglas with respect to the alley issue was correct and so we affirm that order.

THE BASEMENT

There was a trial on the basement issue in the court below wherein evidence was presented and arguments heard. The trial court then ruled in favor of Douglas, ordering Chicago Title as trustee to convey to Douglas certain parcels of land, including the basement area underneath parcel 2. See diagram 2.

Defendants now contend on appeal that the trial court's ruling was erroneous because the manifest weight of the evidence established that conveyance to Douglas, under the option to purchase contained within the Douglas lease, was limited to the property legally described in the plat of survey dated April 2, 1982, thereby excluding the entire basement area beneath parcel 2 of that survey. Defendants further argue that specific performance should not have been available to Douglas since the terms of the lease and option contract were not clear, certain, and definite.

Additionally, defendants contend that the trial court erred when on April 27, 1989, it ordered paragraph 2 of its prior order dated March 9, 1989, vacated and stricken, thereby reversing its order that Douglas reconvey to Chicago Title, as trustee, the 248.8 square feet of land located to the east of the "15-foot line" and above the elevation of 22.29 feet. Finally, defendants contend that the trial court's decision, upon reconsideration, to reserve ruling on the question of damages pending the outcome of the appeals was erroneous since Douglas never sought, prior to trial, severance of the issues of liability and damages and then never produced any evidence at trial on the issue of damages.

Douglas, on the other hand, in addition to responding to the issues raised by defendants, argues in its cross-appeal that the trial court erred by denying it attorney fees and costs.

■■ ■ First we shall consider whether specific performance was available to Douglas. Whether specific performance may be granted is a decision left to the sound discretion of the trial court, which shall not be overturned unless it is against the manifest weight of the evidence. (*Mearida v. Murphy* (1982), 106 Ill. App. 3d 705, 435 N.E.2d 1352.) A court, however, may not award specific performance of a contract for the sale of land unless the contract is clear, definite and complete, and on its face it describes the tract of land to be sold. (*Calvary Temple Assembly of God v. Lossman* (1990), 200 Ill. App. 3d 102, 557 N.E.2d

1309.) However, a description will be deemed sufficient, even when it admits of some doubt, if it furnishes the means of identifying the land. *Bliss v. Rhodes* (1978), 66 Ill. App. 3d 895, 384 N.E.2d 512.

■ In the present case the Douglas lease agreement was clear, definite and complete. It provided in section 10 for an irrevocable option to purchase "the Property AS IS in the condition existing on the date the option herein is exercised and closed." The "Property" was defined in section 1(b) as the "Premises" and "Equipment" and the premises, defined in section 1(a) of the lease, consisted of "the parcel of land described in Exhibit A hereto, subject to and to be replaced by a precise description of said parcel of land." As earlier noted, exhibit A described the parcel of land in terms of the 1974 plat of survey, which the parties knew to be imprecise and was, therefore, to be replaced by a new plat of survey. The new plat of survey, dated April 2, 1982, did provide a new, more precise description of the land subject to the lease and purchase option. This plat of survey divided the land subject to demise into two parcels: parcel 1, which contained no express limitation as to elevation; and parcel 2, which expressly limited the demise to the above-ground portion of the parcel, with the term "not included" written on that portion of parcel 2 below the elevation of 22.29 feet Chicago city datum.

Relying on the above descriptions, one might conclude that the demise subject to the purchase option was limited to the parcels described in the April 2, 1982, survey. However, such a conclusion would ignore the import of section 2, entitled "Bar Area Basement," wherein the lease provided that a certain basement portion of the "Premises" was "not included" in the demise subject to the lease but was to be included in the "Property" subject to the option to purchase.

Section 10 of the lease stated that the bar area basement would be "more particularly described on a plat of survey to be prepared." Although it is true that the plat of survey could have specifically denoted the area termed "Bar Area Basement," which would have eliminated all doubt as to the meaning of that term, it seems clear, when looking at the lease agreement and April 1982 survey as a whole, that the portion of parcel 2 below the elevation of 22.29 feet Chicago city datum, which is described as "not included" on the survey, is the basement portion of the premises, previously described as bar area basement, which was not subject to demise in the lease agreement but subject to the option to purchase. It is the only basement area situated underneath the Douglas premises to which Douglas had no access during the term of the lease and which was used by Gold Standard pursuant to its own lease. This is what the trial court found, and we do not believe this decision to be against the manifest weight of the evidence. We, therefore, conclude

that the bar area basement was described with sufficient particularity and that Douglas was entitled to specific performance. The trial court properly ordered defendants to convey to Douglas parcel 2 in its entirety, both above and below the surface of the ground.

It should be noted here that the conveyance to Douglas of the lower limit of parcel 2 is subject to whatever occupancy rights Gold Standard may have under its lease. As stated in section 10(d)(vi) of the lease, Douglas is entitled to an assignment of lessor's right, title and interest to the lease with Gold Standard Enterprises with respect to the bar area basement, but that in lieu of such assignment, Lessor could elect to (a) construct a masonry wall within the "open passageway between the Bar Area Basement and the premises otherwise occupied by Gold Standard," or (b) credit Douglas $1,500. We construe this to mean that lessor (now Chicago Title, as Trustee) may elect to: (1) assign to Douglas its right to a partial lease with Gold Standard, covering the bar area basement, so that Gold Standard may continue its occupancy of the lower limit of parcel 2 until the year 2003, with payment to Douglas of a portion of its rent; (2) credit Douglas $1,500 for this assignment; or (3) construct a masonry wall to define the boundary of parcel 2 below the surface of the ground.

■ We next consider whether the trial court erred when on April 27, 1989, it reversed its order of March 9, 1989, and caused paragraph 2 of the earlier order to be vacated and stricken. Paragraph 2 of the March 9, 1989, order stated:

> "Defendants are granted specific performance, and plaintiff is required within 30 days hereof to convey to Chicago Title and Trust as trustee in fee simple the following real estate: that part of Parcel 2 on Joint Exhibit 7 above elevation 22.29, east of a line extending the center line of the existing west wall of the Gold Standard store, referred to in paragraph 1(a) above, from the south end of said wall, at a point 19.25 feet north of the south line of Parcel 2, to the south line of Parcel 2."

First of all we would like to comment on an internal inconsistency in defendants' argument on this issue. Although defendants argue that paragraph 2 of the trial court's March 9, 1989, order was correct and should not have been stricken, defendants mistakenly argue on appeal that paragraph 2 of the order required Douglas to reconvey the 248.8 square feet of property to the east of the "15-foot line." To better understand the inaccuracy of this argument, we must turn our attention to some relevant facts.

First, we note that both the Gold Standard lease and the Douglas lease, at least initially, described the premises in terms of a plat of sur-

vey dated May 28, 1974. The Gold Standard lease purported to lease "Lots 1, 2, 3 and the East 15 feet of Lot 4," while the Douglas lease purported to lease "Lots 4 (except the east 15 feet thereof), 5, 6, and 7." (See diagram 1.) However, ironically, nowhere on the plat of survey drawn on April 2, 1982, is this "15-foot line" depicted. In fact, it wasn't until July 2, 1986, when a new plat of survey was made, unbeknownst to Douglas and at the request of Mr. DeYoung, an attorney representing Gold Standard and Harold Binstein, that this 15-foot line was superimposed on a plat of survey which showed the property occupied by both Gold Standard and Douglas.

This survey clearly showed that the 15-foot line had no practical significance. While it was clear that parcel 2 of the Douglas Theater property extended well to the east of the 15-foot line into the property purportedly leased to Gold Standard, it became equally clear that a large portion of the west wall of the Gold Standard liquor store was, in fact, a number of feet to the west of the 15-foot line, encroaching several feet beyond the western limit of its lease. Thus, we conclude that although the legal description of the premises contained in the Gold Standard lease defined the general parameters of that property, the actual boundary of the property subject to the Gold Standard lease was defined by the walls of the commercial building constructed on the property, pursuant to the terms of the lease.

Secondly, we see no need for going outside the Douglas lease or to attempt to define the premises subject to the lease and option to purchase by making reference to the Gold Standard Lease. The Douglas lease clearly and distinctly recognized that the legal description of the premises, given in terms of the 1974 plat of survey, was inaccurate because it did not take into account the changes to the property brought about by the construction of the commercial building by Gold Standard. Thus, it was necessary to have a new plat of survey drawn to describe the property. This was done, and we can find no cogent reason for disregarding the obvious intent to include parcel 2 as part of the Douglas lease and option.

Furthermore, the Douglas lease clearly indicated its intention to extend the Douglas theater premises beyond the 15-foot line when necessary: (1) by recognizing that "the easterly line of the Premises may be somewhat irregular and may vary slightly at the basement, first floor and roof levels, but the interior of the Premises are to be as presently divided by existing walls," and (2) by including a party wall agreement in exhibit D of the lease, which acknowledged that the property was improved by a theater-store building with a party wall which divided the two improvements.

For the above reasons, we can find no error in the trial court's decision to vacate paragraph 2 of the March 9, 1989, order. Paragraph 2 would have required Douglas to reconvey to Chicago Title as trustee property to which it was clearly not entitled.

The next issue before this court is whether the trial court erred by reserving, pending appeal, judgement on the issue of damages. We find that it did not.

When a party sues for specific performance, that party may also seek, and the equity court may award, other relief including monetary damages occasioned by the delay in the performance of the contract. (*Gordon v. Bauer* (1988), 177 Ill. App. 3d 1073, 532 N.E.2d 855.) Although such compensation is referred to as "damages," it is not actually legal damages arising from the breach of the contract, but rather, equitable compensation "in the nature of an accounting" inasmuch as the court is confirming the contract and erasing the breach. (*Grill v. Adams* (1984), 123 Ill. App. 3d 913, 463 N.E.2d 896; *Arnold v. Leahy Home Building Co.* (1981), 95 Ill. App. 3d 501, 420 N.E.2d 699.) When looked at in this manner it is clear that such compensation may be awarded only after a final decision has been made with regard to the specific performance claim. Consequently, we find no abuse of discretion in the trial court's decision to reserve judgment on the issue of equitable compensation pending the outcome of the appeals.

Finally, we turn our attention to Douglas' cross-appeal of the denial of his request for attorney fees and costs. The general rule in Illinois is that each litigant is responsible for his own attorney fees and costs. (*Sorenson v. Fio Rito* (1980), 90 Ill. App. 3d 368, 413 N.E.2d 47.) Ordinarily, each litigant, even the successful one, must pay his or her own costs arising out of the litigation unless a statute, agreement, or stipulation specifically allows for the payment of the other party's attorney fees and costs. *Saltiel v. Olsen* (1981), 85 Ill. 2d 484, 426 N.E.2d 1204.

Douglas argues that the lease agreement involved in this case specifically allowed for fees and costs to be paid in the event of a default in the option agreement. Douglas points to section 21(i) of the lease agreement in support of this position. Section 21(i) states, in pertinent part:

> "Reciprocally, in the event Lessor shall be in default in the performance of any of its obligations under this Lease, and an action shall be brought for the enforcement thereof in which it shall be determined that Lessor was in default, Lessor shall pay to Lessee all expenses incurred or paid by Lessee in connection therewith including reasonable attorneys' fees."

Defendants respond by arguing that the above-cited paragraph is taken out of context. Section 21, which is entitled "Default," lists, in paragraph (a), five occurrences or acts that would constitute default. The following paragraphs, (b) through (j), then discuss the various remedies associated with any such defaults. Thus, defendants argue that the remedy of attorney fees and costs is restricted to the types of leasing defaults discussed in paragraph (a). We agree.

We note, first of all, that section 10 of the lease, entitled "Purchase Option," contains a paragraph (g), which states:

"If, after Lessee has exercised the option herein granted, Lessee shall default and fail to perform any of its obligations hereunder as required hereby, the option granted herein shall thereafter be null and void and of no further force or effect and Lessor shall have the right to any and all remedies it may then have at law and in equity. In the event that the option granted herein is timely and properly exercised and the purchase and sale is not closed by reason of default of Lessor, the Lessee shall have the right to pursue any and all remedies Lessee may then have at law and in equity."

It appears to this court that this paragraph, rather than paragraph 21, delineates the remedies available to a party upon default of the option contract. Consequently, since this provision does not specifically allow for attorney fees and costs, we find that it was not an abuse of discretion for the trial court to have denied Douglas' request for attorney fees and costs.

For all the reasons stated above, we affirm the orders of the trial court in all respects, except that Douglas' entitlement to occupy the entire "Bar Area Basement," which is parcel 3 on the plat of survey dated June 29, 1990, depends upon the option exercised by Gold Standard as stated earlier in this opinion.

Affirmed.

LORENZ, P.J., and COCCIA,* J., concur.

---

*Prior to being reassigned to another division, Justice Michel A. Coccia concurred in the above case.