**Billie WILLIAMS, Plaintiff–Appellant,**

v.

**JADER FUEL COMPANY, INC., Defendant–Appellee.**

No. 90–2333.

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1991.

Decided Oct. 1, 1991.

---

John Ewart (argued), John H. Armstrong (argued), Craig & Craig, Mattoon, Ill., Paul R. Lynch, Craig & Craig, Mt. Vernon, Ill., George P. Latchford, River Forest, Ill., for plaintiff-appellant.

Joshua G. Vincent (argued), Hinshaw & Culbertson, Chicago, Ill., William F. Trapp, Harvey B. Stephens, Brown, Hay & Stephens, Springfield, Ill., James H. Smith, Shawneetown, Ill., D. Bradley Blodgett, William Hardy, Hinshaw & Culbertson, Springfield, Ill., for defendant-appellee.

Before COFFEY, FLAUM and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Plaintiff Billie Williams was the part owner of Lovilia Coal Company. In 1981, Lovilia entered into a contract with defendant Jader Fuels, like Lovilia a coal-mining concern. Under the contract, Lovilia was allowed to mine by sub-surface methods on certain land leased by Jader. Lovilia mined beyond the boundaries of the tract identified in the agreement, and began to tunnel under an adjacent piece of land, also leased by Jader. Jader began strip mining on the second tract, and Jader's strip mine cut into Lovilia's sub-surface mine, causing flooding which damaged mining equipment owned by Lovilia and made continued operation of its mine impossible. Williams sued Jader, claiming that Jader had breached the covenant of good faith and fair dealing implicit in their agreement, that Jader was negligent or willful in strip-mining through Lovilia's sub-surface mine, and that Jader trespassed upon Lovilia's sub-surface mine. The district court granted Jader a directed verdict on all counts except negligence. The jury found in favor of Williams on the negligence issue, but found that the company he part-owned, Lovilia, was thirty percent contributorily negligent. Williams appeals, challenging the district court's grant of directed verdicts on the contract claim, the willfulness claim, and the trespass claims. He also challenges the district

court's refusal to strike several affirmative defenses tendered by Jader, as well as a number of evidentiary rulings. We affirm in part, reverse in part, vacate in part, and remand for a new trial.

## I. FACTS AND PRIOR PROCEEDINGS

This is a tale of two mines. Before 1981, defendant Jader Fuel Company ("Jader") obtained the right to mine coal located on land owned by the Green family in Gallatin County, Illinois ("the Green tract"). On December 1, 1981, Jader entered into an agreement with Lovilia Coal Company ("Lovilia"), a partnership owned by Tommy Wignall and plaintiff Billie Williams. Under the agreement, Jader gave Lovilia the exclusive right to mine, by sub-surface methods, two seams of coal that ran under the Green tract. Lovilia agreed to mine these seams "on a continuing and continuous basis," until the seams "shall have been completely mined." Contract Mining Agreement ("Agreement"), ¶ 6. Jader agreed to market the coal Lovilia extracted from these seams, and to pay Lovilia seventy percent of the sales price it received from coal buyers. Jader retained the right to strip mine on the Green tract.

The Agreement between Jader and Lovilia also contained terms relating to a second tract of land. This land ("the Shawnee tract") was located in an area of Shawnee National Forest which bordered the Green tract to the west. At the time the parties entered into the Agreement, Jader had not yet acquired mining rights to the Shawnee tract, but contemplated that it soon would. Jader granted Lovilia a right of first refusal on the opportunity to mine by sub-surface methods on the Shawnee tract. However, the parties agreed that Lovilia could not mine past the border between the Green tract and the Shawnee tract unless Jader allowed it to do so. Although the contract provision concerning the possibility that Jader would allow Lovilia to mine the Shawnee tract did not specifically require that Jader give its assent to Lovilia in writing, the Agreement specified that "[a]ny and all notices provided for herein shall be in writing." Agreement, ¶ 13.

The Agreement also contained a merger clause stating that it represented the only agreement between the parties, as well as a clause that required all modifications to be in writing. *Id.*, ¶ 18. The parties agreed that the Agreement would terminate if Lovilia failed to mine coal for six successive months.

By April 1982 Lovilia had dug its mine and was removing coal from the Green tract. At some point in 1982, Lovilia began to tunnel to the west, along one of the two seams of coal it was allowed to mine under the Agreement. In the summer of 1982, Williams' partner Tommy Wignall attended a meeting with two Jader employees, mining engineer Gary Carr and mine superintendent Ed Downen. At trial, Wignall testified that Carr and Downen told him that Jader had acquired the right to mine the Shawnee tract, and that Lovilia was free to extend its mine tunnel west across the boundary between the Green tract and the Shawnee tract. Lovilia availed itself of this opportunity, following one of the seams of coal it was permitted to mine across the western border of the Green tract. Jader admits that it became aware of Lovilia's incursion onto the Shawnee tract, but denies that it authorized Lovilia to cross the property line, in writing or otherwise.

After mining to the west along one of the seams of coal, Lovilia began to mine the portion of the other seam lying under the surface of the Green tract. By February 1984 it had reached the northern and eastern limits of the Green tract, and resumed mining to the west along the second seam of coal. Its progress was marked on mine maps prepared monthly by a Lovilia engineer. The engineer prepared a copy of the monthly map for Jader, but the map was not delivered to Jader. Rather it was kept at Lovilia's office at the mine site, and was made available to Jader engineer Gary Carr at Carr's request. Williams testified at trial that the maps accurately described the extent of Lovilia's mine, and that Carr could have seen for himself that at some point in late 1984 or early 1985 the westernmost end of Lovilia's mine tunnel

crossed the boundary between the Green and Shawnee tracts.

As Lovilia dug west, the price of coal headed south. Lovilia began to lose money, and in late March 1985 it stopped mining operations and laid off its miners. However, it continued to employ a skeleton crew to look after the mine and tend the electric pumps that kept the tunnels from flooding. Wignall testified at trial that the shutdown was temporary and that he and Williams anticipated reopening the mine when coal prices rebounded. The halt in mining, however, caused Lovilia to experience serious cash-flow problems. Lovilia's efforts to obtain a loan proved unsuccessful, and in the summer of 1985 it defaulted on payments owed to suppliers from whom it had leased mining equipment. Some of these suppliers repossessed their equipment, removing the belt feeders that carried coal from the mine to the surface as well as other equipment. However, the pumps and the electrical equipment that powered them stayed in place.

In the spring of 1985, Jader applied for a permit to strip mine on the Shawnee tract. While reviewing Jader's application, the state inspector asked Jader's representative about the possibility that the proposed strip mine would cut through underground mine tunnels. The final permit Jader obtained from the state specified that any tunnels cut by the strip mine would be sealed with compacted clay. Jader began strip mining on the Shawnee tract in June 1985. At that time, Carr marked the western limits of Lovilia's mine with two large stakes topped with brightly-colored ribbons. At some point, however, Carr and Downen decided to extend the trench Jader was digging into the surface of the Shawnee tract beyond the stakes. On August 6, 1985, the Jader strip mine cut through Lovilia's mine at a point below the surface of the Shawnee tract. As it had indicated in the state permit, Jader sealed the Lovilia tunnel with fire clay, concealing the entries by August 29, 1985.

John Tucker, a member of the crew Lovilia employed to maintain its sub-surface mine, inspected the mine's western tunnel before and after it was cut by the Jader strip mine. After Jader cut through Lovilia's tunnel, Tucker observed that the flow of water into the Lovilia mine, which had always been a "wet" mine plagued by seepage, increased. The pumps in the Lovilia mine, though apparently old and in poor condition, could cope with the flow of water into the mine until early September 1985, when three days of heavy rains struck southern Illinois. The pumps were unable to handle the heightened flow, and water reached the power transformer that supplied the pumps with current. The transformer shorted, knocking out the pumps, and flooding large portions of Lovilia's mine.

In the wake of the flooding, Tommy Wignall, the Lovilia partner who played the more active role in the mine's operations, filed for bankruptcy. Billie Williams, Lovilia's other partner, filed suit against Jader in district court.[1] Williams' complaint comprised six counts. Count I alleged that Jader had breached the covenant of good faith and fair dealing implicit in the Agreement between Jader and Lovilia when it cut through Lovilia's tunnel. Williams sought ten million dollars in damages for this breach of contract. Count II alleged that Jader failed to exercise due care and caution in cutting through Lovilia's mine, and sought ten million dollars for the damage caused by Jader's negligence. Count III alleged that Jader's actions in cutting through the Lovilia tunnel were willful, and sought ten million dollars in compensatory damages and an additional ten million in punitive damages. Count IV charged Jader with trespassing on Lovilia's coal, and sought twenty million dollars in compensatory damages. Count V alleged that Jader's trespass was malicious and wanton, and added a claim for ten million dollars in punitive damages to the twenty million claimed in Count IV. Count VI alleged that Jader's repeated appropriation of coal

1. Williams initially filed suit in United States District Court for the Central District of Illinois. Early in the litigation, however, Jader successfully moved to transfer this case to the Southern District.

from seams that Lovilia had the right to exploit under the Agreement constituted a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. The RICO count was dismissed early in the litigation and is not before us on appeal. Since the RICO count dropped out, jurisdiction in the district court has been founded solely upon the diversity of citizenship between Williams, a Tennessee resident, and Jader, a Delaware corporation with its principal place of business in Illinois. *See* 28 U.S.C. § 1332(a)(1).

The trial was divided into a liability phase and a damages phase. At the close of evidence in the liability phase, the district court granted Jader's motion for directed verdicts on all remaining counts of Williams' complaint except for Count II, which alleged negligence. The jury found that Jader had been negligent in cutting through Lovilia's tunnel, but also found that Lovilia was thirty percent contributorily negligent. In the damages phase, the jury fixed the total damages suffered by Lovilia at $365,000 and awarded Williams seventy percent of this amount, $255,500. Williams appeals, challenging the district court's award of directed verdicts to Jader on the contract claim, the willfulness claim, and the trespass and wanton trespass claims, as well as rulings denying Williams' motion to strike Jader's proposed affirmative defenses, allowing a jury instruction concerning Lovilia's duty to mitigate damages, and admitting testimony and exhibits offered by several defense witnesses.

## II. DIRECTED VERDICT ON THE CONTRACT CLAIM

Count I of Williams' complaint alleged that in cutting through Lovilia's tunnel, Jader breached the covenant of good faith and fair dealing implied by law in the Contract Mining Agreement between Jader and Lovilia. The district court granted Jader's motion for a directed verdict on this count, and Williams appeals that decision. He argues that there was evidence to suggest that Jader and Lovilia agreed that Lovilia

could mine coal on the Shawnee tract, and that Jader prevented Lovilia from doing so by causing its sub-surface mine to become flooded and therefore unusable. This evidence, Williams suggests, created disputed issues of material fact that should have been resolved by the jury.

Jader's response is two-fold: first, it argues that Illinois law does not provide an independent cause of action for a breach of the implied covenant of good faith and fair dealing. Second, Jader contends that there was no evidence that it had breached any covenant of good faith and fair dealing fairly impliable from the Agreement. Jader points out that it reserved the right to strip mine on the Green and Shawnee tracts, and that Lovilia had no absolute right under the agreement to mine on the Shawnee tract. If Lovilia had not itself breached the Agreement by extending its tunnel below the surface of the Shawnee tract, Jader argues, it would not have come in contact with Jader's strip mining operations. Jader also argues that the evidence Williams introduced at trial concerning the oral permission Jader officials allegedly gave Lovilia to extend its tunnel onto the Shawnee tract was an attempt to evade the contract's merger and no-oral-modification clauses.

" 'When reviewing directed verdicts in diversity cases, we use the state's standard of review.' " *H.B. Fuller Co. v. Kinetic Systems Inc.*, 932 F.2d 681, 686 (7th Cir. 1991) (quoting *Consolidated Bearings v. Ehret–Krohn Corp.*, 913 F.2d 1224, 1227 (7th Cir.1990)). In Illinois, "[a] verdict should not be directed unless 'all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Darnell v. Impact Indus.*, 105 Ill.2d 158, 162, 85 Ill.Dec. 336, 338, 473 N.E.2d 935, 937 (1984) (quoting *Pedrick v. Peoria & E. R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513 (1967)). *See also McMahon v. Eli Lilly & Co.*, 774 F.2d 830, 832 (7th Cir.1985); *Hare v. Foster G. McGaw Hosp.*, 192 Ill. App.3d 1031, 1034, 140 Ill.Dec. 127, 130, 549 N.E.2d 778, 781 (1st Dist.1989), *appeal denied*, 131 Ill.2d 559, 142 Ill.Dec. 882, 553

N.E.2d 396 (1990). Applying this standard, we agree with Williams that there are disputed factual questions material to his claim for breach of contract that preclude the award of a directed verdict.

Under Illinois law, "[e]very contract implies good faith and fair dealing between the parties to it." *Martindell v. Lake Shore Nat'l Bank*, 15 Ill.2d 272, 286, 154 N.E.2d 683, 690 (1958). *See also Unit Trainship v. Soo Line R. Co.*, 905 F.2d 160, 163 (7th Cir.1990); *AMPAT/Midwest v. Illinois Tool Works*, 896 F.2d 1035, 1041 (7th Cir.1990); *First Nat'l Bank of Cicero v. Sylvester*, 196 Ill.App.3d 902, 910, 144 Ill.Dec. 24, 30, 554 N.E.2d 1063, 1069 (1st Dist.), *appeal denied*, 133 Ill.2d 555, 149 Ill.Dec. 320, 561 N.E.2d 690 (1990). As Jader points out, under Illinois law the covenant of good faith and fair dealing is not an independent source of duties assumed by parties to a contract and a breach of the covenant does not by itself create a cause of action. *See Powers v. Delnor Hosp.*, 135 Ill.App.3d 317, 321–22, 90 Ill.Dec. 168, 172, 481 N.E.2d 968, 972 (2d Dist.1985). Rather, the covenant "is in aid and furtherance of other terms of the agreement of the parties," *Gordon v. Matthew Bender & Co.*, 562 F.Supp. 1286, 1290 (N.D.Ill.1983) (internal quotations omitted), and no obligation can be implied which would be inconsistent with the explicit terms of the contract. *Id.* at 1289–90 (citing *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 305, 448 N.E.2d 86, 91, 461 N.Y.S.2d 232, 237 (1983)). The "nature of [the] limitation" imposed by the covenant is that "a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 991, 81 Ill.Dec. 156, 170, 466 N.E.2d 958, 972 (1st Dist.1984). *See also First Nat'l Bank of Cicero*, 196 Ill.App.3d at 910–11, 144 Ill.Dec. at 30, 554 N.E.2d at 1069; *Carrico v. Delp*, 141 Ill.App.3d 684, 690, 95 Ill.Dec. 880, 884, 490 N.E.2d 972, 976 (4th Dist.1986); *Foster Enters. v. Germania Fed. Sav. & Loan Ass'n*, 97 Ill.

App.3d 22, 30, 52 Ill.Dec. 303, 309, 421 N.E.2d 1375, 1381 (3d Dist.1981).

■ Jader argues that Williams' claim is barred by the principle that courts may not create implied duties of good faith and fair dealing which are inconsistent with the explicit terms of the agreement. The explicit terms Jader points to are the provisions of the agreement barring Lovilia from mining on the Shawnee tract without Jader's prior approval, and the provisions requiring that all notices be in writing, prohibiting oral modifications to the contract, and providing that the written terms of the Agreement represented the entire agreement between the parties.

■ Jader's reliance on these provisions is misplaced. Merger clauses stating that the terms of a contract represent the entire agreement are probative of the intent of the parties that the agreement be viewed as complete; Illinois courts called upon to interpret unambiguous agreements containing merger clauses will, as a general rule, refuse to allow "parol evidence of a prior or contemporaneous agreement or terms not included in the instrument." *Commonwealth Eastern Mortgage Co. v. Vaughn*, 179 Ill.App.3d 129, 135, 128 Ill.Dec. 271, 275, 534 N.E.2d 453, 457 (1st Dist.1989). In this case, however, Williams seeks to show that at some point after the parties signed the Agreement, Jader orally permitted Lovilia to mine on the Shawnee tract. While this contention is indeed inconsistent with the terms of the Agreement, the evidence Williams presents to support it consists not of "prior or contemporaneous" agreements which did not find their way into the Agreement and are thus presumptively excluded by the merger clause and the parol evidence rule. Rather, Williams relies on evidence that *after* the conclusion of the Agreement, Jader and Lovilia modified it by permitting Lovilia to extend its mine west of the border between the Green and Shawnee tracts. Neither the parties' inclusion of a merger clause nor the parol evidence rule bars the introduction of evidence of modifications occurring after the formation of a contract. *See, e.g.*, 2 E. Farnsworth, Contracts, § 7.5

at 228 (1990) ("parol evidence rule applies only to precontractual negotiations" and "does not bar evidence of subsequent negotiations to show modification of the contract.").

■ Jader's reliance on the contract's clause barring oral modifications is equally unavailing. It is settled law in Illinois that, except for agreements concerning the sale of goods, see Ill.Ann.Stat. ch. 26, ¶ 2–209(2) (Smith–Hurd 1963), "parties may modify contracts orally after including a contract provision that precludes oral modification." *Ehret–Krohn Corp.*, 913 F.2d at 1231. *See also Monarch Coaches v. ITT Indus. Credit*, 818 F.2d 11, 12 (7th Cir.1987); *Park v. Dealers Transit, Inc.*, 596 F.2d 203, 204–05 (7th Cir.1979); *Falcon, Ltd. v. Corr's Natural Beverages*, 165 Ill.App.3d 815, 821–22, 117 Ill.Dec. 480, 484, 520 N.E.2d 831, 835 (1st Dist.1987); *South Shore Amusements v. Supersport Auto Racing Ass'n*, 136 Ill. App.3d 284, 287, 91 Ill.Dec. 55, 58, 483 N.E.2d 337, 340 (1st Dist.1985); *Estate of Kern v. Handelsman*, 115 Ill.App.3d 789, 794, 71 Ill.Dec. 407, 411, 450 N.E.2d 1286, 1290 (1st Dist.1983). If, as Williams contends, Jader and Lovilia agreed that Lovilia could mine below the surface of the Shawnee tract, the parties modified the Agreement's provision requiring all notices to be in writing, allowing Lovilia to mine without written notice from Jader permitting it to do so.

■ The parties disagree as to whether Jader verbally permitted Lovilia to extend its mine tunnel onto the Shawnee tract.[2] Jader argues that this factual dispute is immaterial to Williams' claim. It contends that whether or not it allowed Lovilia to mine the Shawnee tract, it retained the right under the Agreement to mine the Shawnee tract by surface methods, which was what it was doing when it broke

through Lovilia's tunnel. We take a different view. Resolving this factual dispute in Lovilia's favor, we assume it had Jader's permission to mine the Shawnee tract. If so, by cutting through Lovilia's tunnel Jader exercised its discretion, provided for in the Agreement, to strip-mine the Shawnee tract in such a way as to prevent Lovilia from continuing *its* mining operations. This prevented Lovilia from performing its obligations under the Agreement, which included mining the Green tract on a continuous basis until all the coal was removed from that tract. *See* Restatement (Second) of Contracts § 205 comment d (1981) (bad faith includes "interference with or failure to cooperate in the other party's performance"). Whether or not Jader acted in bad faith depends on whether or not Lovilia mined the Shawnee tract with Jader's permission.[3] Because this question is one for the jury, the district court's award of a directed verdict to Jader on Williams' contract claim was error.

### III. DIRECTED VERDICT ON WILLFULNESS COUNT

Count III of Williams' complaint sought an award of punitive damages on the ground that Jader acted willfully when it cut through Lovilia's tunnel. At the close of Williams' case, Jader moved for a directed verdict on the issue of willfulness, and the district court granted Jader's motion. In its decision denying Williams' motion for a new trial, the district court explained this ruling, writing that "[t]he record before this court and the evidence produced at trial could clearly establish that the defendant reserved the right to mine coal, and it did so. There was absolutely no evidence presented to demonstrate that the defendant intentionally cut into the plaintiff's mine works...." Order, May 15, 1990, at

2. Tommy Wignall testified at trial that Jader gave its authorization at a meeting held in the Summer of 1982. Trial Transcript ("Tr.") at 61. Neither Ed Downen nor Gary Carr could recall this meeting, and both testified that they first learned that Lovilia's tunnel had crossed the Green tract's western boundary in 1983. Tr. 254–55, 295.

3. We do not reach the question of whether Jader's actions are excused by Lovilia's cessation of mining operations in late March 1985, slightly more than four months before Jader broke through Lovilia's mine tunnel. We also leave open the question of whether Jader is estopped from asserting that Lovilia had no right to mine the Shawnee tract because it had notice that Lovilia was doing so and failed to object.

3. On appeal, Williams argues that there was in fact evidence to show both that Jader intentionally cut through Lovilia's mine tunnel and that when it did so, it was aware that it might damage equipment that Lovilia had left in the tunnel. Jader responds that, though it knew the location of Lovilia's underground mine tunnel, it did not intend to cut through the tunnel or to damage mining equipment. Jader points out that after cutting through Lovilia's mine it took steps to protect the exposed portion of the Lovilia tunnel. Jader also argues that it was mining on land for which it retained mining rights, whereas Lovilia had no right to tunnel below the surface of the Shawnee tract.

■ "Illinois courts take rather a dim view of punitive damages, and insist that the plaintiff seeking them demonstrate [ ] extraordinary or exceptional circumstances clearly showing malice or willfulness." *AMPAT/Midwest*, 896 F.2d at 1043 (citations and internal quotations omitted). *See also Loitz v. Remington Arms Co.*, 138 Ill.2d 404, 414, 150 Ill.Dec. 510, 515, 563 N.E.2d 397, 402 (1990) (citing *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 186, 23 Ill. Dec. 559, 384 N.E.2d 353, 360 (1978)). "[T]he initial decision whether punitive damages may be imposed in a particular case in [Illinois] is a matter normally reserved for the trial judge." *Loitz*, 138 Ill.2d at 414, 150 Ill.Dec. at 514, 563 N.E.2d at 401. *See also J.I. Case Co. v. McCartin–McAuliffe Plumbing & Heating*, 118 Ill.2d 447, 453, 114 Ill.Dec. 105, 108, 516 N.E.2d 260, 263 (1987). In making this decision, the trial court views all the evidence in the light most favorable to the party seeking punitive damages. *See, e.g., Queen v. Behm*, 58 Ill.App.3d 253, 255, 15 Ill.Dec. 698, 699, 373 N.E.2d 1382, 1383 (2d Dist.1978).

■ Decisions to direct verdicts in Illinois are generally reviewed de novo, with the appellate court applying the same standard as does the trial court. *See Thomas v. Nelson Bros. Furniture*, 167 Ill.App.3d 49, 53, 117 Ill.Dec. 727, 729–30, 520 N.E.2d 1078, 1080–81 (1st Dist.1988). Notwithstanding this general rule, some Illinois intermediate appellate decisions have applied a more lenient standard when reviewing trial court decisions to direct verdicts on punitive damages counts, examining the trial court's ruling only to determine whether or not the trial judge abused her discretion in directing a verdict for the defendant on the count seeking punitive damages or, alternatively, allowing the jury to consider the question. *See, e.g., PCx Corp. v. Ross*, 209 Ill.App.3d 530, 539–40, 154 Ill.Dec. 311, 317, 568 N.E.2d 311, 317 (1st Dist.1991) ("A request for punitive damages is addressed to the sound discretion of the trial court and a decision to deny such damages will not be reversed absent an abuse of that discretion."); *Motsch v. Pine Roofing Co.*, 178 Ill.App.3d 169, 177, 127 Ill.Dec. 383, 388, 533 N.E.2d 1, 6 (1st Dist.1988) ("[W]here a plaintiff's factual allegations are sufficient to state a claim for punitive damages, the trial court has discretion to submit the issue to the jury, and the court's determination will not be disturbed absent an abuse of that discretion."); *Warren v. LeMay*, 142 Ill.App.3d 550, 580, 96 Ill.Dec. 418, 437, 491 N.E.2d 464, 483 (5th Dist.1986); *Gaunt & Haynes, Inc. v. Moritz Corp.*, 138 Ill.App.3d 356, 363, 92 Ill.Dec. 880, 886, 485 N.E.2d 1123, 1129 (5th Dist.1985); *Behm*, 58 Ill.App.3d at 255, 15 Ill.Dec. at 699, 373 N.E.2d at 1383. In *Loitz*, however, the Illinois Supreme Court hinted that appellate courts should apply the same standard in reviewing directed verdicts concerning punitive damages as do trial courts. Though reversing decisions by the trial and appellate courts allowing the jury to consider the question of punitive damages, the Illinois Supreme Court noted that *it*—not the trial court—reached this conclusion despite "[v]iewing the record in the light most favorable to the plaintiff." 138 Ill.2d at 426, 150 Ill.Dec. at 520, 563 N.E.2d at 407. It supported this proposition with a citation to *Pedrick v. Peoria & E. R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504 (1967), perhaps the leading Illinois case concerning the standard to be applied in deciding motions for directed verdicts. *Loitz*, 138 Ill.2d at 426, 150 Ill.Dec. at 520, 563 N.E.2d at 407. We read *Loitz* to suggest that decisions on

directed verdicts concerning punitive damages counts are not exceptions to the usual Illinois rule that trial court decisions granting or denying directed verdicts are reviewed de novo.[4]

Applying this standard of review, we conclude that the district court erred in preempting the jury's determination as to whether Jader acted willfully in cutting through Lovilia's mine tunnel. As we observed in our discussion of the contract claim at issue in this case, reasonable jurors could conclude based on the evidence presented that Lovilia had received Jader's permission to extend its mine across the western boundary of the Green tract. Jurors could likewise conclude that Jader knew with some measure of certainty how far west of the boundary the Lovilia tunnel extended by the time it began to dig its strip mine. Gary Carr, Jader's engineer, testified that in May of 1985 he and Ed Downen discussed the need to stake off the western limits of the Lovilia tunnel, and that Carr dug long wooden stakes topped with blue and pink ribbons into the surface of the Shawnee tract to indicate the western end of Lovilia's mine tunnel. Tr. 25–28. Nevertheless, Ed Downen, Jader's mining superintendent, testified that he decided that if Jader's strip mine hit Lovilia's sub-surface mine, he would order Jader's miners to cut through Lovilia's tunnel. Tr. 43. Downen also testified that when Jader made its first cut on the Shawnee tract, its employees saw evidence of underground mining activity in the waste that they removed. Nevertheless, Downen ordered two more passes, the second of which cut all the way through Lovilia's tunnel. Tr. 43–44. The parties dispute whether Jader knew or should have known that Lovilia had kept some of its mining equipment in the mine and that, though Lovilia had

ceased active mining operations, it continued to send personnel to inspect the mine periodically. Lovilia offered expert testimony that cutting through the mine tunnel would inevitably interfere with the ventilation and flow of water through the subsurface mine. Tr. 215–18, 234–37. Based on this evidence, we think that reasonable jurors could conclude that in intentionally cutting through Lovilia's mine tunnel, Jader acted "willfully or with such gross negligence as to indicate a wanton disregard of the rights of others." *Parsons v. Winter*, 142 Ill.App.3d 354, 360, 96 Ill.Dec. 776, 781, 491 N.E.2d 1236, 1241 (1st Dist.1986). They could, however, decide that Jader lacked the requisite willfulness because it subjectively believed that it had the right to strip mine on the Shawnee tract and acted in good faith in doing so. *Cf. Behm*, 58 Ill.App.3d at 255, 15 Ill.Dec. at 699, 373 N.E.2d at 1383 (directed verdict in favor of defendants on punitive damages count affirmed where defendants committed trespass "under a clear color of title."). All we need decide today is that, resolving all factual disputes in Williams' favor, the evidence in the district court was sufficient to create triable issues of fact as to whether punitive damages might be appropriate. Because the district court's ruling on Jader's motion for a directed verdict prevented the jury from reaching this question, we reverse and remand.

## IV. DIRECTED VERDICTS ON TRESPASS AND WANTON TRESPASS COUNTS

Count IV of Williams' complaint alleged that Jader trespassed upon Lovilia's rights to the coal located on the Green and Shawnee tracts when it cut through Lovilia's mine tunnel. Williams claimed damages in the amount of twenty million dol-

---

**4.** In *In re Estate of Wernick*, 127 Ill.2d 61, 129 Ill.Dec. 111, 535 N.E.2d 876 (1989), the Illinois Supreme Court reviewed the decision of an intermediate appellate court, which had reversed a trial court's decision, rendered in a bench trial at the close of all the evidence, to refuse plaintiff's request for an award of punitive damages. Identifying the standard of review that it and the appellate court employed, the Supreme Court wrote that it would not disturb the find-

ing of a trial court "unless it is against the manifest weight of the evidence." Here too, the Supreme Court did not distinguish between the standard of review applied to trial court decisions concerning punitive damages and the standard of review it applied to these decisions generally. *See id.* at 85–86, 129 Ill.Dec. at 120, 535 N.E.2d at 887 (citing *Schulenburg v. Signatrol*, 37 Ill.2d 352, 356, 226 N.E.2d 624, 626 (1967)).

lars, which he asserts equals the profit Lovilia would have realized from the continued operations of its mine. Count V realleges the facts set forth in Count IV, and alleges additionally that Jader's actions were malicious and wanton. In addition to the twenty million dollars claimed in Count IV, Count V seeks an additional ten million dollars in punitive damages for the trespass. The district court granted Jader's motion for a directed verdict on Counts IV and V. In a post-trial decision, it explained this ruling by noting that Jader had retained the right to mine coal on both the Green and Shawnee tracts and thus could not be liable for trespassing upon Lovilia's coal.

On appeal, Williams argues that Lovilia's contractual right to mine coal located in two seams under the Green and the Shawnee tracts is sufficient to allow it to maintain an action for trespass. Jader responds that under the Agreement it retained the right to mine by other than sub-surface methods on both the Green and Shawnee tracts, and that its rights to the coal preclude its liability in an action for trespass.

We agree with Jader and the district court that Williams has failed to present facts that would establish a claim for trespass or wanton trespass. Williams is right to observe that in Illinois, "the gist of" a trespass action "is an injury to possession." *Lawless v. Pierce*, 118 Ill.App.3d 747, 753, 74 Ill.Dec. 83, 85, 455 N.E.2d 113, 115 (1st Dist.), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1983). *See also Krejci v. Capriotti*, 16 Ill.App.3d 245, 247, 305 N.E.2d 667, 669 (1st Dist.1973). He argues that the Agreement gave Lovilia the exclusive right to mine coal on the Green tract—and possibly the Shawnee tract as well—by sub-surface methods. However, the exclusive right to mine coal by sub-surface methods is not the same thing as the exclusive right to mine coal. With respect to coal that could be reached by both sub-surface and strip-mining methods (which seems to include all the coal in the two seams Lovilia was permitted to mine) Jader and Lovilia had equal rights.

Notwithstanding the non-exclusivity of Lovilia's interest, it relies upon a series of venerable decisions allowing actions by one mining company against another when the plaintiff concern has an *exclusive* right to mine coal on a given tract of land. The non-exclusivity of Lovilia's right to the coal, however, is sufficient to distinguish the cases upon which Williams relies upon from the facts of this dispute. For example, in *Hartford Iron Mining Co. v. Cambria Mining Co.*, 93 Mich. 90, 53 N.W. 4 (1892), the plaintiff and defendant were licensees, each of which enjoyed the exclusive right to mine on one of two adjoining parcels of land. Plaintiff Hartford brought suit to recover in trover from defendant Cambria, which Hartford alleged was mining under the surface of its land. The Michigan Supreme Court noted that a prerequisite to Hartford's action was the nature of its interest in the land: an exclusive license to mine. *Id.* at 93, 53 N.W. at 5. In distinguishing cases upon which Cambria relied, the Court quoted from the New Jersey Chancery Court's opinion in *East Jersey Iron Co. v. Wright*, 32 N.J.Eq. 248 (Ch.1880). In *East Jersey Iron*, the Court wrote that a non-exclusive license allows the licensor, to " '[it]self take ore from the same land or mine, or license others to do so.' " *Hartford Iron Mining*, 93 Mich. at 94, 53 N.W. at 5 (quoting *East Jersey Iron*, 32 N.J.Eq. at 255). In this case, Jader and Lovilia agreed that the latter would have a non-exclusive license, permitting Jader to "itself take ore from the same land or mine." It is not liable in trespass for doing so.

The agreement between Jader and Lovilia created rights to the coal that might usefully be viewed as a tenancy in common, in which each of the two parties held an undivided interest to all the coal identified in the Agreement. *See In re Victor*, 218 F.Supp. 218, 220 (S.D.Ill.1963); *Douds v. Fresen*, 392 Ill. 477, 480, 64 N.E.2d 729, 731 (1946). This does not mean that either could conduct its mining operations in such a way as to preclude the other from doing the same. For example, in *Douglas Theater v. Gold Standard Enters.*, 188 Ill. App.3d 573, 136 Ill.Dec. 278, 544 N.E.2d

1053 (1st Dist.1989), the plaintiff movie house and the defendant liquor store both had the right to use a parking lot, under instruments that specified "that each lessee's use shall be in common with the other on a 'first-come-first-served basis.'" *Id.* at 575, 136 Ill.Dec. at 280, 544 N.E.2d at 1055. The appellate court held, however, that the right to use the lot on a first-come-first-served basis "cannot mean that the lot may be used in such a way as to interfere with the use by another lessee for the normal operation of its business." *Id.* at 579, 136 Ill.Dec. at 283, 544 N.E.2d at 1058. Rather, the Court suggested that the parties to the common tenancy were required to deal fairly with each other.

If indeed Illinois law views the mutual duties of tenants in common—like those of parties to a contract—to include a duty to deal with each other fairly and in good faith, it is unclear what distinguishes Williams' trespass claim from his contract claim. More fundamentally, Illinois does not permit tenants in common to sue each other for trespass. *Conklin v. Newman,* 278 Ill. 30, 36, 115 N.E. 849, 851 (1917); *Dishinger v. Bon Air Catering,* 336 Ill. App. 557, 567, 84 N.E.2d 562, 567 (2d Dist. 1949). We agree with the district court that, given the non-exclusive nature of Lovilia's interest in the coal, it could not, as a matter of law, sustain a trespass action against Jader. Of course, if Williams cannot maintain a trespass action, neither can he maintain an action for wanton and malicious trespass.

## V. JADER'S AFFIRMATIVE DEFENSES

The next issue on appeal concerns four affirmative defenses put forward by Jader to be used in the liability phase of this divided trial. All these defenses related to Count II of Williams' complaint, which alleged that Jader was negligent in cutting through Lovilia's mine tunnel. At the instructions conference late in the liability phase of the trial, Williams moved unsuccessfully to strike each of these defenses.

■ Federal Rule of Civil Procedure 12(f) permits a district court to strike portions of a pleading "[u]pon motion made by a party before responding to a pleading, or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party." The Federal Rules do not permit a response to an answer that does not contain a counterclaim. *See* Fed.R.Civ.Pro. 7(a); 5 C. Wright & A. Miller, Federal Practice & Procedure (Civil) § 1183 at 14 (2d ed. 1990). Williams' motion, then, falls within the second clause of Rule 12(f)'s timing requirements, the clause applicable to motions to strike pleadings to which "no responsive pleading is permitted" under the Rules. Under this clause, he was required to make his motion to strike Jader's affirmative defenses within 20 days after he was served with Jader's answer. Jader's first answer, which is not included in the record on appeal, was filed with the district court on June 12, 1987. Its amended answer, which is in the record and does contain the four affirmative defenses at issue, was filed on October 7, 1988. Williams' motion to strike these affirmative defenses, however, was not made until November 30, 1989.

However, neither Jader nor the district court contested the timeliness of the motion, and the district court proceeded to consider it at the instructions conference. Tr. 416–423. Rule 12(f) provides that a district court "may order stricken from any pleading any insufficient defense," "upon the court's own initiative at any time." Courts have read Rule 12(f) to allow a district court to consider a motion to strike at any point in a case, reasoning that it is considering the issue of its own accord despite the fact that its attention was prompted by an untimely filed motion. *See, e.g., FDIC v. British–American Corp.,* 744 F.Supp. 116, 117 (E.D.N.C.1990); *National Union Fire Ins. v. Alexander,* 728 F.Supp. 192, 194 (S.D.N.Y.1989); *Krauss v. Keibler–Thompson Corp.,* 72 F.R.D. 615, 617 (D.Del.1976); *Uniroyal, Inc. v. Heller,* 65 F.R.D. 83, 86 (S.D.N.Y.1974); *Stonybrook Tenants Ass'n v. Alpert,* 29 F.R.D. 165, 168 (D.Conn.1961). The district court elected

to reach the merits of Williams' motion to strike despite its untimely filing. We, too, address the merits.

The four affirmative defenses tendered by Jader all concerned Lovilia's alleged contributory negligence. The first defense was that Lovilia failed to keep Jader apprised of the location of its underground mine works. The second was that Jader mined coal from the Shawnee tract, which it was not permitted to do under the Agreement, thereby exposing its works to flooding. The third was that Lovilia failed to properly pump water from its mine tunnels. The fourth was that Lovilia failed to remove its underground mining equipment from the mine after halting mining operations in late March 1985. Williams contends that the district court's failure to strike each of the defenses was error. As to the first defense, he argues that whether or not Lovilia kept Jader informed of where it was mining, the evidence at trial established that Jader knew the location of Lovilia's tunnel. As to the second, Williams contends that whether or not Jader was in an unauthorized zone is irrelevant to the question of whether Lovilia's negligence contributed to Jader's actions in cutting through Lovilia's tunnel. As to both the third and fourth, Williams concedes that the defenses might be relevant to the question of whether Lovilia mitigated its damages after Jader cut through its mine tunnel, but he argues that neither is relevant to the question of contributory negligence. Williams suggests that allowing the jury to consider these two defenses in relation to contributory negligence in the liability phase of the trial and then to consider them again with regard to mitigation in the damages phase resulted in "double-counting" and a diminished award of damages.

■■■■ Affirmative defenses will be stricken "only when they are insufficient on the face of the pleadings." *Heller Financial v. Midwhey Powder Co.,* 883 F.2d 1286, 1294 (7th Cir.1989). Motions to strike "are 'not favored and will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense,'" *Glenside West Corp. v. Exxon Co.,* 761 F.Supp. 1100, 1115 (D.N.J.1991) (quoting *Durham Indus. v. North River Ins. Co.,* 482 F.Supp. 910, 913 (S.D.N.Y.1979)), and are inferable from the pleadings, *see United States v. 416.81 Acres of Land,* 514 F.2d 627, 631 (7th Cir. 1975). In a diversity case, the legal and factual sufficiency of an affirmative defense is examined with reference to state law. *See Farmers & Merchants State Bank v. Norfolk & Western Ry.,* 673 F.Supp. 946, 947 (N.D.Ind.1987).

■■■ "Contributory negligence is lack of due care for one's safety as measured by the objective reasonable-man standard. In other words, the plaintiff is required to exercise that care which the reasonably prudent person would take to avoid injury in like circumstances." *Long v. City of New Boston,* 91 Ill.2d 456, 463–64, 64 Ill. Dec. 905, 908, 440 N.E.2d 625, 628 (1982) (citation omitted). However, "[i]t is not every negligence of a plaintiff that will be considered ... for the purpose of allocation of damages." *Owens v. Stokoe,* 115 Ill.2d 177, 183, 104 Ill.Dec. 694, 697, 503 N.E.2d 251, 254 (1986). Rather, " '[t]he plaintiff's negligence will not [reduce] recovery unless it is a proximate cause of his injury.' " *Id.,* 104 Ill.Dec. at 697, 503 N.E.2d at 254 (quoting 4 F. Harper, F. James & O. Gray, The Law of Torts, § 22.10 at 342 (2d ed. 1986)).

■■■ Applying this substantive law and the lenient procedural standard used to decide a motion to strike an affirmative defense, we can dispose easily of the first defense Williams argues should not have reached the jury. In this defense, Jader asserted that Lovilia was contributorily negligent in failing to inform Jader of the location of Lovilia's tunnel. This contention is not inconsistent with reasonable inferences that could be drawn from the pleadings, most importantly that Jader did not know that Lovilia had begun to mine west of the border between the Green and Shawnee tracts. And, if the factual underpinnings of this defense were to be proven, it might well represent a failure on Lovi-

lia's part to exercise due care that contributed to Jader's strip mine cutting through Lovilia's sub-surface mine. The district court correctly refused Williams' motion to strike this defense.

The same is true for the second affirmative defense. The question of whether Lovilia had the right to mine the Shawnee tract, as our earlier discussions of the contract and willfulness claims suggest, is both a central issue in the case and one upon which the parties differ. It is not inconsistent with the pleadings for Jader to argue that Lovilia had no right to extend its tunnel onto the Shawnee tract, and that in doing so, it increased the risk that Jader, which contemplated strip mining on the Shawnee tract at the time of the Contract Mining Agreement and thereafter, would strip-mine through Lovilia's mine works. If Lovilia never received permission to mine under the Shawnee tract, doing so was not only a breach of the Agreement but may have been contributorily negligent as well, particularly given its knowledge that Jader planned at some point to conduct surface mining on the land.

The third and fourth affirmative defenses present more difficult questions. Neither is inconsistent with the pleadings, and neither presents facts inconsistent with fair inferences that could be drawn from the pleadings. However, it is unclear how either could have caused, either alone or in combination with other proximate causes, Jader to strip-mine through Lovilia's sub-surface mine. Rather, both seem to relate more to Lovilia's alleged failure to mitigate the injury it suffered when Jader mined through its tunnel, or, in other words, to prevent the avoidable consequences of Jader's action from occurring.

The doctrines of contributory negligence and mitigation of damages (also known as avoidable consequences) are "[s]omewhat similar." W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser & Keeton on the Law of Torts, § 65 at 458 (5th ed. 1984).

> The statement commonly made as to the distinction between the two is that contributory negligence is negligence of the plaintiff before any damage, or any invasion of his rights, has occurred, which bars all recovery. The rule of avoidable consequences comes into play after a legal wrong has occurred, but while some damages may still be averted, and bars recovery only for such damages.

*Id.* See also Restatement (Second) of Torts § 918 comment a (1977); *Nilson-Newey & Co. v. Ballou*, 839 F.2d 1171, 1175 (6th Cir.1988) (unlike contributory negligence, duty to mitigate damages "arises only after the defendant's tortious conduct, not before it"); *Kirby v. Larson*, 400 Mich. 585, 617, 256 N.W.2d 400, 416 (1977) (plurality opinion) ("Negligence subsequent to the injury is distinguished from contributory negligence, which is negligence that contributed proximately to cause the injury."). We believe that both Jader's third and fourth affirmative defenses concern Lovilia's alleged failure to protect its mine and its mining equipment from being flooded *after* August 5, 1985, when Jader cut through Lovilia's tunnel and allegedly increased the flow of water into Lovilia's underground works.

In a diversity case applying the law of a state which adheres to a pure comparative negligence system for apportioning damages in tort cases, the distinction between reducing a plaintiff's damages because of its comparative negligence and doing the same because it failed to take reasonable steps to avert the consequences of the defendant's tortious conduct might be of little moment. A jury in a pure comparative negligence jurisdiction could reduce the portion of total damages attributable to the defendant for one reason or the other, and reach the same result. Illinois was for most of the 1980s a pure comparative negligence jurisdiction, *see Alvis v. Ribar*, 85 Ill.2d 1, 27–28, 52 Ill.Dec. 23, 33–34, 421 N.E.2d 886, 896–97 (1981), but in 1987 adopted a modified form of comparative negligence which provides that tort plaintiffs cannot recover damages "if the trier of fact finds that the contributory fault on the part of the plaintiff is more than 50% of the proximate cause of the injury or damage for which recovery is sought." Ill. Ann.Stat. ch. 110, ¶ 2–1116 (Smith–Hurd Supp.1991). Under Illinois' modified com-

parative negligence statute, the distinction between acts which establish contributory negligence and acts which establish a failure to mitigate damages regains some of the importance it had in the era of pure contributory negligence. *See* Prosser & Keeton, *supra*, § 65 at 458 & n. 71 (collecting cases). Under the statute, for example, a plaintiff who suffers $100,000 in damages because of an automobile accident for which he was forty-five percent at fault would recover $55,000. If the jury were also to conclude that the plaintiff's failure promptly to seek medical attention following the accident—perhaps the prototypical example of a failure to mitigate damages—was the cause of $15,000 of his injuries, it would reduce the award to $40,000. If, however, the jury was instructed that the failure to seek medical help was contributory negligence, it might find that the plaintiff was sixty percent culpable, leading it to deny the plaintiff *any* recovery.

The divided trial in this case added another wrinkle. Because a jury finding that Lovilia was more than fifty percent contributorily negligent would bar Williams from recovery, the issue of comparative negligence was appropriately resolved in the liability phase. *Cf. Nilson–Newey*, 839 F.2d at 1175 (failure to raise issue of contributory negligence in liability phase of bifurcated trial in diversity action applying law of contributory negligence state waives issue). The question of whether Williams' recovery should be reduced because of Lovilia's failure to prevent the occurrence of avoidable consequences such as the flooding of the mine, however, related to the amount of its recovery and was properly addressed in the damages phase. The district court, however, characterized all of Jader's affirmative defenses as relating to contributory negligence and allowed the jury to consider all of them in the liability phase. Then, as is discussed more fully below, it instructed the jury in the damages phase that Lovilia had a duty to mitigate. We agree with Williams that the district court's failure to strike the third and fourth affirmative defenses invited the jury to reduce plaintiff's damages twice, once in the liability phase in the guise of contrib-

utory negligence and a second time in the damages phase in assessing whether Lovilia complied with its duty to mitigate. Because this may have led the jury to allocate too high a percentage of the damages it determined Williams suffered to Lovilia's negligence before and after Jader cut through its mine, we vacate and remand for a new trial on Count II of Williams' complaint. On remand, the district court remains free to instruct the jury on Jader's first two affirmative defenses in the liability phase. The second two affirmative defenses, however, relate to the question of mitigation and should be considered only in the damages phase.

## VI. JURY INSTRUCTION ON DUTY TO MITIGATE

Williams' next argument on appeal is closely related to his previous argument concerning the affirmative defenses. In the damages phase, the district court instructed the jury that Lovilia had a duty to use ordinary care to minimize the damages caused it by Jader's allegedly tortious conduct. On appeal, Williams contends that the district court erred in giving this instruction because it had previously allowed the jury to consider Jader's third and fourth affirmative defenses, which Williams characterizes as relating to Lovilia's duty to mitigate rather than to its contributory negligence. As we have previously discussed, we agree with that characterization. It was error for the district court to both instruct the jury on the last two of Jader's affirmative defenses in the liability phase and to instruct it on Lovilia's duty to mitigate in the damages phase.

Beyond the "double-counting" problem, however, we can find no error in the district court's jury instruction. "A party has a right to have the jury instructed on its theory of recovery or defense if that theory is supported by facts in evidence or by reasonable inferences from facts in evidence." *Wallace v. Weinrich*, 87 Ill.App.3d 868, 877, 42 Ill.Dec. 721, 728, 409 N.E.2d 336, 343 (5th Dist.1980). *See also Shaheed v. Chicago Transit Auth.*, 137 Ill.App.3d 352, 360, 92 Ill.Dec. 27, 34,

484 N.E.2d 542, 549 (1st Dist.1985); *Harris v. Day,* 115 Ill.App.3d 762, 772, 71 Ill.Dec. 547, 552, 451 N.E.2d 262, 267 (4th Dist. 1983). The evidence at trial showed that Lovilia's employee, John Tucker, observed increased water accumulation in visits to the mine he made in the days and weeks after Jader cut through Lovilia's tunnel and observed that the water had reached some of Lovilia's mining equipment. Tr. 125–131. Reasonable jurors could have concluded that Lovilia's failure to remove equipment from the mine or otherwise to protect itself from the increased danger of flooding in the weeks between early August 1985, when Jader cut through Lovilia's tunnel, and early September 1985, when heavy rains increased the flow of water into the mine beyond the capacity of Lovilia's pumps, represented a failure to prevent the avoidable consequences of Jader's tortious conduct from coming to pass.

## VII. TESTIMONY OF ROY GREER

In the damages phase of the trial, Jader called Roy Greer, a state mining official whose responsibilities included inspecting the Lovilia mine. Greer testified that he last walked through the mine in March 1985 and observed various pieces of mining equipment, including golf carts and other wheeled vehicles used to travel through the mine, a battery charger, and an arc welder. Tr. 560–564. In response to defense questioning, he said that all this equipment was sufficiently portable that it it could be removed from the mine without exceptional efforts. Williams objected to Greer's testimony, but this objection was overruled. On appeal, he argues that Greer had no personal knowledge as to what equipment was in the mine at any time after his March 1985 visit, making his testimony irrelevant to the question of whether Lovilia had removed equipment from the mine before August 5, 1985, when Jader cut through its tunnel, or had attempted to mitigate its damages by removing this equipment after that date, once it became apparent that the flow of water into the mine had increased.

 We review district court decisions concerning the admission or exclusion of evidence on grounds of relevance only for abuse of discretion. *Taylor v. National R.R. Passenger Corp.,* 920 F.2d 1372, 1375 (7th Cir.1990). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. In this case, the "fact that is of consequence" is whether Lovilia failed to mitigate its damages by keeping mining equipment in its mine unnecessarily. Greer's testimony is relevant because it establishes what equipment was in Lovilia's mine in March 1985, shortly before it stopped mining and four months before Jader cut through Lovilia's tunnel, and establishes that this equipment was easy to remove. This makes Lovilia's failure to remove the equipment when water accumulated in its tunnel seem less reasonable and more like the negligent failure to prevent the avoidable consequences of Jader's actions. Of course, Greer's testimony is not as probative on the question of Lovilia's mitigation efforts as the testimony of someone who visited the mine in the days after Jader cut through Lovilia's tunnel. But this shortcoming goes to the weight the jury should have given Greer's observations, not to the relevance of his testimony. Williams brought this shortcoming in Greer's testimony to the jury's attention on cross-examination, eliciting from the mining inspector the concession that Greer did not know what equipment was in the mine in September, when the mine began to fill with water. Tr. 565. The defense's line of questioning, though of limited probative value, was relevant, and the district court did not abuse its discretion in allowing it.

## VIII. TESTIMONY OF ROGER MYERS/USE OF EXHIBITS

 Williams' next evidentiary challenge also concerns testimony presented in the damages phase of the trial. One of Jader's witnesses in the damages phase was its general manager, Roger Myers. Myers was asked a series of questions con-

cerning the trend in the price per ton of coal Jader received when it sold coal during the period from 1983 to 1986. For the most part, that trend was downward. Williams interposed a variety of objections to this line of questioning at trial, and the ground he urges for its exclusion on appeal is not entirely clear from the abbreviated discussion of the issue in his brief. We believe he is objecting to the relevance of Myers' testimony about the prices Lovilia could have expected to receive for its coal based on its past earnings. Williams seems to be objecting because Myers based his testimony on the prices Jader received for all the coal it sold, which included coal mined by Lovilia and marketed by Jader pursuant to the Agreement as well as coal Jader mined itself. As Williams points out, the prices Jader received for the coal that it sold do not accurately represent the price Lovilia received or would have received for coal it mined, because the coal Jader extracted from its strip mining operations on the Green and Shawnee tracts generally fetched a lower price than the coal Lovilia extracted through its sub-surface mining operations. Lovilia's contribution to the coal sold by Jader, in other words, was worth more per ton than the average price per ton Jader received for a mixture of coal mined by Lovilia and Jader.

Here, too, we conclude that Myers' testimony satisfies Rule 401's standard of relevance. Williams sought damages for the lost profits Lovilia could have derived from coal left in the ground and rendered inaccessible by the flooding of its mine. The value of coal in the ground is dependent on its market price. Williams' argument implicitly concedes that the prices Jader received for the coal it sold were not wholly unrelated to the price willing buyers would pay for Lovilia's coal alone. The discrepancy between the two goes to the weight to be afforded Myers' testimony concerning coal prices, and was fully explored on cross examination. The district court did not abuse its discretion when it allowed this testimony.

Williams makes a second argument which also relates to Myers' testimony, and which requires a brief discussion of the procedural history of this lawsuit. This action was initially filed in the Central District of Illinois, but was soon transferred to the Southern District. There it was first assigned to Chief Judge Foreman, who presided over discovery and before whom the final pre-trial conference was held. Between the pre-trial conference and the date upon which trial was to begin, Judge Foreman recused himself, and the case was reassigned. Judge Foreman employs a standing order with respect to final pre-trial conferences which requires litigants to identify all exhibits which they plan to use at trial at the conference.

When Myers took the stand during the damages phase of the trial, he was questioned by Jader's counsel concerning the average price per ton of coal Jader received during a two-year period beginning at the start of Jader's 1984 fiscal year, October 1, 1983, and ending at the end of its 1985 fiscal year, September 30, 1985. Jader offered into evidence accounting statements prepared for each of these fiscal years showing the average price per ton it had received in each of these years. Myers was asked how he derived these figures and he made reference to accounting ledgers he maintained showing individual sales made by Jader. Williams' counsel objected that the accounting statements were summaries of voluminous documents, apparently raising the applicability of Federal Rule of Evidence 1006. That rule requires that a party wishing to introduce into evidence a summary of voluminous documents must make the originals available to the other parties for inspection and copying at a reasonable time and place. In response, Myers was allowed to testify using the ledgers themselves, which the district court allowed into evidence despite the fact that they were not included in the list of exhibits Jader said it would use at the pre-trial conference before Judge Foreman. On appeal, Williams relies on Judge Foreman's rule concerning pre-trial conferences, arguing that Jader never indicated that it would introduce the accounting ledgers at the conference and so should have been barred from introducing them at trial. Williams

argues that the district court's decision to allow these ledgers into evidence contravenes Judge Foreman's standing order.

■ We believe that Williams' reliance on Judge Foreman's rule is unavailing. First, we note that while the specific ground or grounds Williams' counsel gave as the basis for his repeated objections to the admission of the ledgers are shrouded in the mists of colloquy, one that he clearly did not raise was Judge Foreman's rule. "[A] specific objection made on the wrong grounds and overruled precludes a party from raising a specific objection on other, tenable grounds on appeal." 1 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 103[02] at 103–25 to –26 (1990). *See also Hale v. Firestone Tire & Rubber*, 756 F.2d 1322, 1333–34 (8th Cir.1985) ("An objection at trial on one ground will not enable the objecting party to rely on appeal on other grounds that were not stated in the trial objection."); *Playboy Enters. v. Public Serv. Comm'n*, 906 F.2d 25, 40 (1st Cir.) (where objection at trial was made on hearsay grounds, argument that statement was not credible was waived on appeal), *cert. denied*, — U.S. —, 111 S.Ct. 388, 112 L.Ed.2d 399 (1990); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1440 (9th Cir. 1990) (where objection to admission of photograph at trial was made on grounds of relevance and lack of foundation, argument that photograph was not authenticated is waived on appeal); *Jay Edwards, Inc. v. New England Toyota Distrib.*, 708 F.2d 814, 823 (1st Cir.) (where objection to admission of evidence at trial was made on grounds of relevance, argument that evidence was unduly prejudicial was waived on appeal), *cert. denied*, 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983). Because Williams did not raise Judge Foreman's rule at trial, and the rule is not a ground "apparent from context," Fed.R.Evid. 103(a)(1), he may not assert the rule on appeal.

Second, even assuming we should reach the merits of Williams' challenge, the import of his argument seems to be that he was unfairly surprised by the district court's admission of the ledgers despite Judge Foreman's rule that documents not identified at the pre-trial conference may not be introduced at trial. Because we are remanding, however, Williams is now forewarned that Jader may once again seek to introduce the ledgers.[5]

## IX. TESTIMONY OF JAY BUCK

Williams' final evidentiary challenge, and the last issue on appeal, concerns the testimony of Jay Buck, a certified public accountant whom Jader presented as an expert witness. Jader's counsel asked Buck a series of hypothetical questions concerning whether Lovilia would have realized a profit from its coal mining operations had they continued beyond September 1985. The capstone of Buck's testimony came when he was asked to compare his estimate of Lovilia's cost per ton of coal mined and the revenue per ton Lovilia would have realized when its coal was marketed by Jader. Buck testified that in 1985 Lovilia would have lost approximately eighty cents per ton of coal sold. He testified that this figure would have risen to almost two dollars per ton in 1986, when coal prices fell further.

On appeal, Williams characterizes Buck's testimony concerning Lovilia's future losses as "speculative," noting that though Buck calculated the declining price of coal using the price per ton received by Jader, his cost figures for Lovilia's mine were based on Lovilia's expenses in its last full year of operations, 1984. According to Williams, this assumption fails to take into account the possibility that Lovilia could have cut its costs in response to the decline in the market price of coal.

■ Clearly Buck's testimony concerning Lovilia's future potential for profit was relevant to the question of the losses it

---

5. Williams has not pursued his Rule 1006 challenge on appeal, but we note that the trial record suggests that it might well have been meritorious. On remand, the district court may choose to require Jader to allow Williams the opportunity to examine the ledgers should Jader again desire to introduce them.

suffered when its mine was flooded. Just as clearly, the contention that Buck's opinion was speculative goes to the weight jurors might choose to accord his testimony. Williams' lawyer explored various weaknesses in Buck's estimates of future profitability when he cross-examined the accountant, including Buck's failure to recognize the possibility that Lovilia would tighten its belt. Buck could, of course, offer no more than his educated guesses about Lovilia's profitability based on price trends in the coal market and Lovilia's past production costs. However, expert testimony concerning future earnings potential has been allowed in federal courts even where that testimony is based on chancier assumptions than those made by Buck in his appraisal of Lovilia's outlook. *See, e.g., Salas by Salas v. Wang*, 846 F.2d 897, 904 (3d Cir.1988) (Fed.R.Evid. 702 permits expert economist to testify that child who suffered brain damage during childbirth would suffer damages, over his lifetime, equal to present value of 6.5 million dollars); *Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284, 287 (9th Cir.1975) (not error to permit expert economist to testify as to lost future earnings of railway worker killed in workplace accident). The district court was well within its discretion in allowing Buck to testify concerning his opinion that Lovilia would have lost money had it continued to operate.

Williams also challenges a series of questions put to Buck by Jader's counsel concerning Lovilia's unsuccessful efforts to obtain a loan in early 1985. Jader's counsel asked Buck whether Lovilia would have been able to obtain the loan they were seeking. Tr. 650. Williams argues on appeal that the question was outside the scope of Buck's expertise.

We are unable to agree. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 211 (7th Cir.1990). Buck testified that his practice as an accountant includes business planning, a subject which necessarily involves evaluating whether and how much a company will be able to borrow from lenders. Decisions concerning the competency of experts to testify concerning a given subject "are committed to the discretion of the trial judge and its determination will be affirmed unless it is manifestly erroneous." *Id.* (internal quotations omitted). *See, e.g., IMPACT of Northwest Florida v. Firestone*, 893 F.2d 1189, 1195 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 133, 112 L.Ed.2d 100 (1990); *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 115 (3d Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987). Given what we can glean from the record concerning Buck's qualifications, the decision to allow him to testify concerning Lovilia's ability to secure financing was not an abuse of discretion.

## X. CONCLUSION

To sum up, we reverse the district court's award of directed verdicts in favor of Jader on Counts I and III of Williams' complaint, and remand for trial on these counts. We affirm the district court's decision to grant Jader directed verdicts on Counts IV and V, as well as its decisions concerning the various challenged evidentiary rulings. We vacate the judgment in favor of Williams on Count II and remand for a new trial on that count. Circuit Rule 36 shall not apply upon remand.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.