May 26, 1993
[NOT FOR PUBLICATION]

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1837

BENEFIT MANAGEMENT OF MAINE, INC.,

Plaintiff, Appellant,

v.

ALLSTATE LIFE INSURANCE CO., ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. W. Arthur Garrity, Jr.,* Senior U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Young,** District Judge.

Robert W. Harrington for appellant.

William J. Kayatta, Jr. with whom Catherine R. Connors, Pierce,

Atwood, Scribner, Allen, Smith & Lancaster, John E. Hughes, III,

Walter D. Willson, Wells, Wells, Marble & Hurst, and Ralph J. Elwart

were on brief for appellees.

* Of the District of Massachusetts, sitting by designation.
** Of the District of Massachusetts, sitting by designation.

YOUNG, District Judge. From a welter of

various claims, sounding in both contract and tort,

Appellant Benefit Management of Maine, Inc. ("Benefit"), a

retail purveyor of various insurance products, here raises

the propriety of two pre-trial rulings as well as two

aspects of the directed verdict which ultimately dashed its

hopes. After a thorough review of the entire trial record,

we affirm.

Since the four issues raised on appeal arise

out of the contractual relations between the parties, we

sketch those matters briefly at the outset to put the

following discussion in context.1

On or about September 9, 1983, Benefit

executed a Group Agency Agreement with Northbrook Life

Insurance Company ("Northbrook"). Under the Group Agency

Agreement, Benefit had an exclusive agency to sell certain

Northbrook group health insurance products in Maine, New

Hampshire, and Vermont. On or about April 13, 1984,

1 As Benefit's case began to sink on summary judgment and
ultimately foundered upon a directed verdict, we draw all
reasonable inferences in Benefit's favor throughout.
Continental Grain Co. v. Puerto Rico Maritime Shipping

Auth., 972 F.2d 426, 431 (1st Cir. 1992) (inferences drawn

against party prevailing on summary judgment); DiPalma v.

Westinghouse Electric Corp., 938 F.2d 1463, 1464 (1st Cir.

1991) (inferences drawn against party prevailing on directed
verdict).

-2-
2

Northbrook and its parent Allstate Life Insurance Co.

("Allstate") contracted with Equitable Life Assurance

Society of the United States ("Equitable") to have Equitable

agents sell certain insurance products of Northbrook. Since

this Northbrook-Equitable agreement arguably infringed

Benefit's exclusive agency, Northbrook offered, and Benefit

accepted, an Amended Group Agency Agreement which permitted

the sales by the Equitable Agents in return for a reduction

in Benefit's franchise fee as well as added contractual

protections for Benefit.

On March 18, 1988, Northbrook, claiming

severe business losses, sent Benefit a formal notice of

withdrawal and suspension pursuant to the Amended General

Agency Agreement.2 At the same time, Northbrook offered

Benefit a limited Service Agreement ("the Northbrook Service

Agreement") which allowed Benefit certain renewal marketing

and extended claims paying authority on the Northbrook

policies then in force which were being serviced by Benefit.

2 This notice stated, in pertinent part:

Current business conditions have caused
Northbrook to revaluate its Group Agency
operations, resulting in our withdrawal from
the small-to-medium sized employer group life
and health insurance market in certain market
territories.

-3-
3

Likewise, Allstate offered Benefit a service agreement ("the

Allstate Service Agreement") which granted Benefit marketing

and claims administration authority for certain future

insurance business under the Allstate name.

Benefit was reluctant to enter into these two

service agreements (collectively the "1988 Service

Agreements") since the offer was extended for but a short

time and then on a 'take it or leave it basis,' and since

the termination provisions were less favorable to Benefit

than those found in the Amended General Agency Agreement.

The alternative, however, was no further business

relationship at all with a most lucrative account.3 Since

Allstate was dangling the prospect of a longer term

relationship,4 Benefit signed.

3 During 1988, Benefit derived more than 65% of its revenues
from its Northbrook business -- a sum of over $2,000,000
from which Benefit received commissions of approximately
$665,000.

4 Allstate's agents communicated with Benefit as follows:

The term of the new Allstate contract is one year.
We anticipate that during this year major changes
will evolve in our strategy of healthcare
delivery. . . . This provision has not been
included with the idea of terminating without a
continuation option. It has been placed in the
contract to prompt renegotiation more favorable to
all parties when the cycle is complete and our
local market strategy is solidified.

-4-
4

Less than two months later Northbrook and

Allstate gave notice that they were terminating the 1988

Service Agreements with Benefit.

This action ensued, Benefit charging, among

other claims, breach of contract and fraud. Certain of its

claims succumbed to summary judgment; the remainder

collapsed when the District Court allowed a motion for

directed verdict in favor of Northbrook and Allstate.

Benefit's appeal raises four issues.

1. Denial by the Magistrate Judge of Benefit's

Motion

to Compel

On April 23, 1991, in the course of preparing

for trial, Benefit moved to compel discovery of fourteen

documents which Allstate and Northbrook had withheld from

production on the grounds that they were protected by the

attorney-client privilege and the work-product doctrine. In

support of its motion, Benefit argued that the documents

were subject to the crime-fraud exception to the privilege.

After a hearing and an in camera review of

the documents, the Magistrate Judge denied the motion due to

Benefit's failure to make the requisite prima facie showing

of fraud. On June 10, 1991, Benefit filed a motion for

-5-
5

reconsideration. No memorandum in support of the motion was

filed, in violation of Local Rule 19 of the United States

District Court for the District of Maine. Instead, Benefit

submitted an amended Rule 19 Statement of Material Facts

signed by counsel for Benefit for submission in opposition

to the pending summary judgment motion by Allstate and

Northbrook. After a hearing, the Magistrate Judge denied

the motion to reconsider. No transcript of the hearing is

available in the record.

On July 10, 1991, the first day of trial,

Benefit filed a "Motion for Reconsideration By the Presiding

Judge of a

Decision of the Magistrate Judge Entered July 2, 1991." No

supporting memorandum was filed. The District Judge

informed Benefit that he would not rule immediately on the

motion, that he would not reverse the Magistrate Judge on a

"judgment call" on a discovery issue, but that "[i]f, on the

other hand, there's a matter of law here involved, some

legal issue that you can indicate was erroneously decided

and you are clearly right, well then, I would maybe hear you

at 4 o'clock next Friday afternoon or something." Benefit

has presented no evidence that it raised the issue again

with the District Court or pressed for a ruling thereon.

-6-
6

Accordingly, we rule that Benefit has waived this issue by

its failure to develop the record in the District Court.

Pursuant to 28 U.S.C. 636(b)(1)(A) (1991),

"[a] judge may designate a magistrate to hear and determine

any pretrial matter pending before the court [with

exceptions not relevant here] . . . . A judge of the court

may reconsider any pretrial matter under this subparagraph

(A) where it has been shown that the magistrate's order is

clearly erroneous or contrary to law." See also Park Motor

Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604 (1st Cir.

1980). Consideration of discovery matters by a magistrate

judge comes within the purview of the above subsection (A).

See Detection Systems, Inc. v. Pittway Corp., 96 F.R.D. 152,

154 (W.D.N.Y. 1982); Citicorp v. Interbank Card Assn, 87

F.R.D. 43, 46 (S.D.N.Y. 1980).5 "Moreover, in resolving

discovery disputes, the Magistrate is afforded broad

discretion which will be overruled only if abused."

Detection Systems, Inc., 96 F.R.D. at 154. Interpreting

5 Subsection (b)(1)(B) of 28 U.S.C. 636 permits a district
judge to designate a magistrate judge to conduct hearings
and to submit proposed findings of fact and recommendations
regarding dispositive motions and other matters specifically
excepted from subsection (b)(1)(A). A district judge shall

make a de novo review of these findings if a party objects

within the required time period. It is undisputed, however,
that subsection (b)(1)(A) applies to the instant discovery
matter.

-7-
7

this subsection, the First Circuit has stated that "[u]nder

subsection (b)(1)(A) certain pretrial matters may be decided

without further reference to the district judge, but the

judge 'may reconsider . . . where it has been shown that the

magistrate's order is clearly erroneous or contrary to

law.'" ParkMotor Mart,616 F.2d at604 (omission inoriginal).

In the instant case, the District Judge was

under no obligation to review the decision of the Magistrate

Judge. The District Judge here offered Benefit an

opportunity to present something concrete showing that the

decision was clearly erroneous but the opportunity was never

exercised by Benefit. Other than concerns as to subject

matter jurisdiction, we are reluctant to consider on appeal

a matter upon which the District Judge was given no

opportunity to rule. Park Motor Mart, 616 F.2d at 605.

This is a corollary of the well settled appellate rule that

"issues adverted to [on appeal] in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are

deemed waived." United States v. Zannino, 895 F.2d 1, 17

(1st Cir. 1990), cert. denied, 494 U.S. 1082 (1990). Upon

this record, we conclude Benefit waived its challenge to the

ruling of the Magistrate Judge.

-8-
8

2. Exclusion of the Group Agency Agreement

Claims

Benefit filed its complaint on June 19, 1990.

On the day prior to the expiration of its right to amend,

Benefit moved to amend its complaint and the District Court

duly allowed this motion. When Northbrook and Allstate

challenged the amended complaint by a motion for summary

judgment, the briefing revealed a dispute concerning whether

Benefit had claimed, in its amended complaint, a breach of

the Amended General Agency Agreement. The District Court

ruled that no such claim had been set forth in the Amended

Complaint.

Benefit argues that mention of "contracts" in

Counts I and II of the Amended Complaint are references to

the Amended General Agency Agreement as well as to the 1988

Service Agreements. Benefit also argues that references to

"agreements" throughout the Amended Complaint are to the

Amended General Agency Agreement and the 1988 Service

Agreements. Lastly, Benefit urges that it pursued its claim

for breach of the Amended General Agency Agreement in a

number of significant pleadings and that Allstate and

Northbrook were fully prepared and would not have been

prejudiced by the trial of these claims.

-9-
9

These arguments are unpersuasive. A reading

of the Amended Complaint as a whole supports the

determination of the District Court that the Amended

Complaint does not state a claim for breach of the Amended

General Agency Agreement. In its recitation of the facts in

the Amended Complaint, Benefit makes a perfunctory reference

to Northbrook's exercise of the Withdrawal and Suspension

clause of the Amended General Agency Agreement by alleging,

"Northbrook exercised its termination power under the

Agreement." This allegation does not challenge Northbrook's

actions in any way. Moreover, a fair reading of the word

"contracts" in Counts I and II is most reasonably a

reference to the 1988 Service Agreements. In fact, as the

District Court observed, Count I (alleging breach of

contract against Allstate) could not refer to the Amended

General Agency Agreement since Allstate was not a party to

that agreement and had no contractual relationship with

Benefit prior to the 1988 Allstate Service Agreement.

Finally, Benefit's argument that it has

pursued its claim for breach of the Amended General Agency

Agreement throughout the pleadings and that Allstate and

Northbrook should therefore have been on notice and prepared

to respond to these claims at trial is

-10-
10

without merit. This is tantamount to a claim that the

District Court ought have allowed a further motion to amend

the complaint -- a motion Benefit never made. Rule 15(a) of

the Federal Rules of Civil Procedure permits amendment to

the pleadings "by leave of court or by written consent of

the adverse party." Rule 15(b) provides that pleadings may

be amended to conform to the evidence where issues not

raised by the pleadings are tried by the express or implied

consent of the parties. Here, Northbrook and Allstate

oppose any such amendment and the District Court was never

asked to approve a further amendment. Even if the actions

of the District Court could be interpreted as a denial of a

motion by Benefit to further amend the Amended Complaint,

such a denial was well within the discretion of the district

judge. See Riofrio Anda v. Ralston Purina Co., 959 F.2d

1149, 1154-55 (1st Cir. 1992) (affirming district court's

denial of motion to amend after deadline for amendments has

passed as consistent with purpose of Rule 15[b]). Here, the

original Complaint was filed on June 19, 1990. The District

Court ordered that all amendments to the pleadings be made

by November 30, 1990. Since Benefit did not even raise the

issue before the summary judgment hearing on or about June

-11-
11

24, 1991, there was no abuse of discretion in denying any

further motion to amend.

3. Fraud

We next consider whether Northbrook's and

Allstate's conduct was fraudulent. As to this aspect of the

case, Benefit relies especially upon the testimony of Mark

Stadler, former general manager of Northbrook. Stadler

administered the 34 Northbrook General Agencies (NGA's)

including Benefit, and he and others at Northbrook used

language such as "partners" and "partnerships" as matter of

course in referring to the NGA's. In February, 1988, when

Northbrook was considering withdrawal from the Amended

General Agency Agreements, however, Stadler, in an internal

memo, opined that the NGA's "are sitting ducks!" Two days

later, in another internal memo, he sketched this approach

to further contract negotiations:

-- Terminate Northbrook Contracts - reinstate

under
Allstate

-- Remove Exclusivity Clause

-- Run out Northbrook Certificates . . .

rollover to
Allstate Paper . . .

-- Immediately begin writing Allstate . . .

-12-
12

-- Limit term of agreement to one year

Benefit also presented evidence that in March, 1988, prior

to the issuance of the notice of Withdrawal and Suspension,

Allstate had been advised by McKinsey & Co., a business

consulting company, that Allstate would need to invest at

least $100,000,000 into its group life and health insurance

business in order to be competitive.

Then, four days before Northbrook issued its

formal withdrawal and suspension notice, Stadler wrote to

his superior, noting that "all of the NGA's feel that we

have Breached [sic] our agreement not to act in a matter

detrimental to them" and suggesting:

I believe we need to ask ourselves if the
tables were turned would we sign the [proposed
1988 Service] agreements as they are currently
worded. I doubt it. The NGA's have been good
partners. We should not turn our backs on them
now.

During the same period, as the negotiations

leading to the execution of the 1988 Service Agreements spun out,

Allstate and Northbrook agents continued to claim that Allstate

"will be a player in the health insurance business," despite the

fact that other Allstate representatives were, even then, meeting

with Goldman Sachs investment bankers to discuss the sale of

Allstate's group life and health business.

-13-
13

From this evidence and other corroborating

circumstances, Benefit argues strenuously that it can reasonably

be inferred that Northbrook and Allstate -- in league together --

concocted the notice of withdrawal and suspension of the Amended

General Agency Agreement primarily to get out from under its

terms. Then, well knowing that they were ultimately going to

dump Benefit just as soon as it suited them, they offered in its

place the 1988 Service Agreements.

There is no dispute as to the fraud claim but

that the law of Maine applies. In Maine,

[a] defendant is liable for fraud or deceit if
he (1) makes a false representation (2) of a
material fact (3) with knowledge of its falsity
or in reckless disregard of whether it is true
or false (4) for the purpose of inducing
another to act or to refrain from acting in
reliance upon it, and (5) the plaintiff
justifiably relies upon the representation as
true and acts upon it to his damage.

Jourdain v. Dineen, 527 A.2d 1304, 1307 (Me. 1987) (quoting

Letellier v. Small, 400 A.2d 371, 376 [Me. 1979]). Moreover, to

sustain its burden on the claim of fraud, Benefit "must prove

every element of [its] claim by clear and convincing evidence; in

other words, evidence that establishes every factual element to

be highly probable." Wildes v. Ocean National Bank of Kennebunk,

498 A.2d 601, 602 (Me. 1985).

-14-
14

Benefit asserts that in order to properly

exercise its rights under the Withdrawal and Suspension clause of

the Amended General Agency Agreement,6 Northbrook had not only

to cease marketing group life and health insurance through the

NGA distribution system, but also through all distribution

systems in Benefit's territory as well, including Equinet, the

Equitable distribution system. Benefit argues that the Notice of

Withdrawal and Suspension and accompanying letter dated March 18,

1988 represented that "Northbrook was ceasing and suspending

marketing group life and health insurance policies in Benefit's

territory," which notice, Benefit says, was false because

Northbrook maintained an ongoing contract with Equitable to sell

the same products in Benefit's territory.7 In support of its

6 The Withdrawal and Suspension clause of the Amended
General Agency Agreement states:
The Company [Northbrook] may withdraw all or
any part of the authority granted to the Group
Agency [Benefit] in Sections 1 and 2 hereof,
with respect to any line or lines of insurance
which the Company has decided to cease or sus-
pend writing in any or all of the location(s)
in which the Group Agency has been authorized
hereunder. The Company will give not less than
one hundred eighty (180) days advance notice to
the Group Agency prior to such cessation or
suspension.

App. I at 105.

7 Prior to trial in the District Court, Benefit's counsel at
various times had pointed to other oral statements as being
allegedly false. These other promissory estoppel and fraud

-15-
15

argument, Benefit has provided us with numerous citations to

documents and testimony by Allstate and Northbrook officers to

show that the Withdrawal and Suspension was not intended to

affect the Equinet distribution system.

Where, as here, the District Court has ruled

that the evidence is insufficient to sustain a particular

proposition, our standard of review is well settled:

[W]e must find that, viewing the evidence in
the light most favorable to the non-moving
party, reasonable jurors could come to but one
conclusion. We must give [Benefit] every
benefit of every legitimate inference.
However, such inferences may not rest on
conjecture or speculation, but rather the
evidence offered must make 'the existence of
the fact to be inferred more probable than its
nonexistence.'

DiPalma v. Westinghouse Electric Corp., 938 F.2d 1463, 1464 (1st

Cir. 1991) (quoting Goldstein v. Kelleher, 728 F.2d 32, 39 [1st

Cir. 1984], cert. denied, 469 U.S. 852 [1984]) (other citations

omitted). Where a plaintiff must establish each of the elements

of its claim by clear and convincing evidence, a trial judge

necessarily must be guided by this heightened evidentiary

theories were dismissed on summary judgment. Supp. App. at
pp. 11-13. Benefit has not appealed the granting of summary
judgment on any fraud claims. In its Brief on Appeal,
Benefit relies only on the single alleged theory of fraud
discussed above. Appellant's Brief at pp. 18-19 ("The false
statement was the notice of withdrawal and suspension . . .
.").

-16-
16

standard in determining, for purposes of a motion for directed

verdict, whether a jury could reasonably conclude that the

plaintiff has met its burden. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 255 (1985).

There was no error in the District Court's

analysis of Benefit's fraud claim. While it is true, as Benefit

claims, that the Notice of Withdrawal and Suspension states not

only that Northbrook is planning to discontinue its NGA

distribution system, of which Benefit was a part, but goes on to

represent that Northbrook is withdrawing from "the small-to-

medium size employer group life and health insurance market in

certain market territories," App. I at 227, this representation

was not false. After an exhaustive trek through the entire

record, we find no indication that Benefit presented any evidence

from which it could be inferred that Northbrook or Allstate

continued to sell group policy insurance in Benefit's area after

March, 1988, when Northbrook represented that it would stop.

Much of the evidence presented by Benefit implies that Northbrook

intended to continue selling products through Equitable after

that date, but Benefit has not shown that Northbrook ever made

any such sales. Since no jury could reasonably find that this

representation was false, an essential element of the fraud claim

-17-
17

is absent. The District Court thus appropriately granted a

directed verdict.8

4. Breach of Contract9
4. Breach of Contract

Benefit argues that the District Court,

misinterpreting and misapplying Illinois law, improperly directed

a verdict for Allstate and Northbrook on its claims for breach of

the two 1988 Service Agreements and breach of the duty of good

faith and fair dealing.

Since we here review a diversity case brought

in the United States District Court for the District of Maine, we

must determine the applicable law as would a court of the state

of Maine. Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487,

8 In his opinion, the District Judge stated that Allstate
and Northbrook could not have marketed group life and health
insurance in Maine after January 1, 1988, because they had
sold this portion of the business to Metropolitan. Even if
there were evidence to the contrary, as Benefit says, i.e.,
that the Equitable business was exempted from the transfer
to Metropolitan, Benefit still has shown no actual sales by
Equitable, only the potential for sales. Any error by the
trial judge regarding this matter is therefore harmless.

9 Benefit also argues on this point that the District Court
improperly characterized the testimony of Benefit's damages
expert as contrary to the evidence. We need not reach this
issue since it was not a ground on which the District Court
based its directed verdict, viz., "[The weakness of the
expert testimony] is not an independent ground of the
Court's granting the motion for directed verdict,
nevertheless it's a factor. It's sort of a background con-
sideration which the Court has not felt it should ignore. .
. ."

-18-
18

496-97 (1941). Each of the 1988 Service Agreements contained

choice of law provisions stating that Illinois law would govern

each contract. Since a Maine court, under established

principles, would honor contractual choice of law and apply the

law of the state of Illinois in this case, we shall do the same,

as did the trial court. Lincoln Pulp & Paper Co., Inc. v. Dravo

Corp., 436 F. Supp. 262, 268 (D. Me. 1977).

Benefit's Amended Complaint asserted separate

claims for breach of contract (Counts I and II) and breach of the

duty of good faith and fair dealing (Counts V and VI). The

District Court consolidated the breach of fair dealing counts

with the breach of contract counts, ruling that Illinois did not

recognize an independent cause of action for breach of the duty

of good faith.

The District Court then directed a verdict for

Northbrook and Allstate on the contract claims. The court

reasoned (1) that where independent business people knowingly

enter into a contract, they must bear responsibility for its

terms, (2) that the Northbrook Service Agreement provided for

termination upon 90 days notice and the Allstate Service

Agreement likewise provided for termination, albeit on 180 days

notice, (3) that the requisite notices had been given, and (4)

that, even in the context of a franchise agreement, the covenant

-19-
19

of good faith and fair dealing does not supervene express

contractual terms. Benefit here challenges the decision of the

District Court to fold the issue of good faith and fair dealing

into the two contract counts (thus dismissing those counts that

asserted that issue as an independent cause of action) and its

ultimate legal conclusion that, notwithstanding the implied

covenant of good faith, the express terms of the 1988 Service

Agreements governed and were fulfilled.

Benefit relies on P&W Supply Co., Inc. v. E.I.

DuPont de Nemours & Co., Inc., 747 F. Supp. 1262, 1268 (N.D. Ill.

1990) for the proposition that Illinois recognizes a separate

cause of action for bad faith termination of a franchisee in

violation of state law. P&W Supply Co., however, held only that

an independent cause of action exists pursuant to the Illinois

Franchise Disclosure Act ("Franchise Act"), Ill. Rev. Stat. ch.

815, 705/1 et seq. (1993) (formerly ch. 121 , 1701 et seq.).

See 747 F. Supp. at 1267-68. The instant action was not brought

under the Franchise Act, but under common law. Indeed, Benefit

could not have brought this action under the Franchise Act

because that statute applies only to Illinois dealerships.

Highway Equipment Co. v. Caterpillar Inc., 908 F.2d 60, 64 (6th

-20-
20

Cir. 1990) (Franchise Act enacted to benefit Illinois residents

only).10

We agree with the District Court that the

Franchise Act is inapplicable and, further, that no independent

cause of action exists under the common law of Illinois. "Under

Illinois law, a covenant of good faith and fair dealing is

implied in every contract." Capital Options Investments v.

10 Allstate and Northbrook also assert that their re-
lationships with Benefit did not satisfy the requirements
for a franchise agreement under the Franchise Act. The
Franchise Act defines a franchise as a contract or agreement
by which --
(a) a franchisee is granted the right to engage in
the business of offering, selling, or distributing
goods or services, under a marketing plan or
system prescribed or suggested in substantial part
by a franchisor; and (b) the operation of the
franchisee's business pursuant to such plan
or system is substantially associated with the
franchisor's trademark, service mark, trade name,
logotype, advertising, or its other commercial
symbol designating the franchisor its affiliate;
and (c) the person granted the right to engage in
such business is required to pay, directly or in-
directly, a franchise fee of $500 or more.

Ill.Rev.Stat. ch. 815, 705/3 (1993) (formerly ch. 121 ,
1703(1)).

We need not decide whether the District Court
correctly determined that a reasonable jury could have found that
the 1988 Service Agreements between Benefit and Allstate and
Northbrook respectively were franchise agreements. Even if these
agreements were franchise agreements under the Franchise Act, as
they pertain to businesses outside Illinois they are entitled to
no more protection than other agreements. Highway Equipment Co,

908 F.2d at 64 (extraterritorial franchise agreements are not
protected by the Franchise Act).

-21-
21

Goldberg Bros., 958 F.2d 186, 189 (7th Cir. 1992); P&W Supply

Co., 747 F. Supp. at 1267. Breach of the implied covenant,

however, does not create an independent cause of action. Beraha

v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir. 1992);

Williams v. Jader Fuel Company, Inc., 944 F.2d 1388, 1394 (7th

Cir. 1991). Claims for breach of the implied covenant of good

faith and fair dealing are, therefore, considered as part of a

claim for breach of contract. See e.g., LaScola v. U.S. Sprint

Communications, 946 F.2d 559, 565 (7th Cir. 1991) (no independent

action sounding in contract for breach of an implied covenant of

good faith and fair dealing in the employment-at-will setting);

Harrison v. Sears, Roebuck & Co., 546 N.E.2d 248, 256 (Ill. App.

Ct. 1989) (same); Gordon v. Matthew Bender & Co., Inc., 562 F.

Supp. 1286, 1290 (N.D. Ill. 1983) (same); Foster Enters., Inc. v.

Germania Fed. Sav. and Loan Ass'n, 421 N.E.2d 1375, 1380-81 (Ill.

App. Ct. 1981) (discretion authorized under a contract but exer-

cised in bad faith results in an actionable breach of contract).

But see BA Mortgage and Int'l Realty Co. v. American Nat'l Bank

and Trust Co. of Chicago, 706 F. Supp. 1364, 1373 (N.D. Ill.

1989) (limiting the holding of Gordon v. Matthew Bender to

employment at will situations).

-22-
22

Unlike the result which obtains under the

Franchise Act,11 we conclude that, absent special

circumstances, the duty of good faith implied at common law in

Illinois may not supplant the express terms of a contract. In

Illinois, the term "good faith" refers to "an implied undertaking

not to take opportunistic advantage in a way that could not have

been contemplated at the time of drafting, and which therefore

was not resolved explicitly by the parties." Kham & Nate's Shoes

No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th

Cir. 1990); see also Capital Options Investments, 988 F.2d at

189. Thus, while principles of good faith -- such as a

requirement of good cause for termination -- may be imposed to

fill the gap where a contract is silent, see e.g., Dayan v.

McDonald's Corp., 466 N.E.2d 958, 973 (Ill. App. Ct. 1984)

(stating in dicta that where a franchise contract is wholly

silent on the issue of termination, "the implied covenant of good

faith restricts franchisor discretion in terminating a franchise

agreement to those cases where good cause exists"), "no

obligation can be implied which would be inconsistent with the

explicit terms of the contract." Williams, 944 F.2d at 1394.

11 Under the Franchise Act the implied covenant of good
faith may override the express terms of a contract. P&W

Supply Co, 747 F. Supp. at 1268 (franchisor may not

terminate absent good cause even though contract provided
for termination on 30 days notice with or without cause).

-23-
23

"Firms that have negotiated contracts are entitled to enforce

them to the letter, even to the great discomfort of their trading

partners, without being mulcted for lack of 'good faith.'" Kham

& Nate's Shoes, 908 F.2d at 1357; Highway Equipment Co., 908 F.2d

at 64, n.3 (at common law "no case in ... Illinois ... has

applied a good cause obligation" to contravene an express

termination at will provision); Hentze v. Unverfehrt, 604 N.E.2d

536, 539 (Ill. App. Ct. 1992). Thus, compliance with the

explicit terms of a termination agreement is, absent actual "bad

faith" or "opportunistic advantage-taking," Hentze, 604 N.E.2d at

539 (citing Kham & Nate's Shoes, 908 F.2d at 1357), good faith

conduct notwithstanding the economic consequences imposed upon

the terminated party.

The present case, though factually

distinguishable from both express and silent termination clause

cases, falls comfortably within the ambit of the former.12

12 It must be candidly recognized, however, that in each of
the cases cited by Allstate and Northbrook for the
proposition that where a contract expressly provides for
termination without cause there is no room for implying a
requirement of good cause, the termination clause was some-
what more explicit than that in the present case. See

Highway Equipment Co., 908 F.2d at 64 (right to terminate

"without cause"); Valley Liquors, Inc. v. Renfield

Importers, Ltd., 822 F.2d 656, 669 (7th Cir. 1987), cert.

denied, 484 U.S. 977 (1987) (right to terminate "at any time

and for any reason"); see also Corenswet, Inc. v. Amana

Refrigeration, Inc., 594 F.2d 129, 132 (5th Cir. 1979),

cert. denied, 444 U.S. 938 (1979) (right to terminate "at

-24-
24

Here, each of the 1988 Service Agreements contains an express

termination-upon-notice provision which may be exercised "without

regard to the terms above" -- terms which detailed the grounds

for termination for cause.13 We agree with the District Court

and rule that the contract language adopted by the parties here

authorized termination at will upon notice and that this language

may not, under the common law of Illinois, be vitiated absent bad

faith.

Under Illinois law, "bad faith" has been

described as "opportunistic advantage-taking or lack of

cooperation depriving the other contracting party of his

reasonable expectations," Hentze, 604 N.E.2d at 539 (citing Kham

& Nates Shoes, 908 F.2d at 1357), or as conduct "violat[ing]

community standards of decency, fairness or reasonableness," Zick

any time for any reason").

13 The termination provisions provided that: "Termination
of the Agreement at the option of either party without
regard to the terms set out above may be effected by such
party providing the other with one hundred and eighty days
(180) written notice" [ninety days in the case of the
Northbrook Service Agreement]. The terms "set out above" in
the 1988 Service Agreements provided a number of reasons why
Allstate and Northbrook could terminate for cause (e.g.
bankruptcy of the Administrator's [Benefit's] business,
gross negligence, fraud or embezzlement by the
Administrator, etc.). Indeed, Benefit refers to the
termination provision in the 1988 Service Agreements as
"much more favorable to Allstate" than were the cognate
provisions of the Amended General Agency Agreement.

-25-
25

v. Verson Allsteel Press Co., 623 F. Supp. 927, 929 (N.D. Ill.

1985), or "generally implying or involving actual or constructive

fraud, or a design to mislead or deceive another, or a neglect or

refusal to fulfill some duty or some contractual obligation, not

prompted by an honest mistake as to one's rights or duties but by

some interested or sinister motive." Valley Liquors, 822 F.2d at

670 (quoting Black's Law Dictionary 127 [5th Ed. 1979]).

Here, Benefit itself adduced the evidence that

in 1988 Allstate needed an infusion of $100,000,000 in order to

remain competitive in this market. This evidence, coupled with

the fact that Northbrook and Allstate treated all the NGA's as

shabbily as they had Benefit conclusively demonstrates the

absence of malice toward Benefit. True, Allstate and Northbrook

did not cover themselves with glory in their retreat from the

market that sustained Benefit. The "good hands" people are here

revealed as much less than the cooperative partners they held

themselves out to be. Instead, this record makes abundantly

clear that both Allstate and Northbrook single-mindedly pursued

their economic advantage with little regard for the consequences

to Benefit and the other NGA's and maneuvered in such a way as to

squeeze the last bit of service out of their soon to be dumped

"partners."

-26-
26

Their conduct, however, driven as it was by

economic necessity, does not rise to the level of bad faith under

the law of Illinois. Although this Court is aware of no Illinois

law directly on point, it has generally been held that when a

product line is withdrawn from the market, good cause exists for

terminating the contract. See Medina & Medina v. Country Pride

Foods, Ltd., 858 F.2d 817, 824 (1st Cir. 1988) (following answer

of the Supreme Court of Puerto Rico to certified question from

the First Circuit, good faith withdrawal from the market does not

violate Puerto Rico franchise act); Lee Beverage Co. v. I.S.C.

Wines of California, 623 F. Supp. 867, 868 (E.D. Wis. 1985) (good

cause for termination where dealer withdrew product line from

market) (Wisconsin state law); St. Joseph Equipment v. Massey-

Ferguson, Inc., 546 F. Supp. 1245 (W.D. Wisc. 1982) (same)

(Wisconsin state law).14 Compare Hentze, 604 F.2d at 539-540

(termination of dealership contract amounted to "bad faith"

14 In Wright-Moore Corp. v. Ricoh Corp., 908 F.2d 128, 138

n.4 (7th Cir. 1990), the Seventh Circuit reserved the market
withdrawal issue for another case but stated in dicta that
other courts have considered market withdrawals to
constitute good cause since they carry little chance of
unfair dealing. The Seventh Circuit rejected, however, the
broad holding in American Mart Corp. v. Joseph E. Seagram &

Sons, Inc., 824 F.2d 733, 734 (9th Cir. 1987), relied on by

Allstate, that business considerations of a franchisor could
constitute good cause for termination. Id. at 138.

-27-
27

because of tactics aimed at running terminated dealership out of

business).

Since here there was good cause to withdraw

this insurance product line from the market, the District Court

was correct in ruling that Benefit presented insufficient

evidence for a jury to find that Allstate or Northbrook

terminated the 1988 Service Agreements in bad faith.

CONCLUSION

The District Court having dealt properly with

the discovery matter addressed by the Magistrate Judge, having

appropriately declined to permit further amendment of the

complaint, and having justifiably directed a verdict as to both

the contract and fraud counts, its decision is, in all respects,

Affirmed.

-28-
28